505 P.2d 275

**Sol LEDERMAN, dba Airways Metals & Refining Co., Appellant,**

v.

**PHELPS DODGE CORPORATION, a corporation, Appellee.**

**No. 2 CA–CIV 1172.**

Court of Appeals of Arizona, Division 2.

Jan. 19, 1973.

Rehearing Denied Feb. 20, 1973.

Review Denied March 27, 1973.

Ralph R. Benson and Ralph C. Morones, ·by Ralph R. Benson, Hollywood, Cal., for appellant.·

·Debevoise, Plimpton, Lyons & Gates by Andrew C. Hartzell, Jr., New York City, and Evans, Kitchel & Jenckes, P. C. by Earl H. Carroll and G. Starr Rounds, Phoenix, for appellee.

KRUCKER, Judge.

Appellant Lederman was one of several defendants in a suit by Phelps Dodge to recover damages, compensatory and punitive, allegedly resulting from a conspiracy to defraud Phelps Dodge. The case was tried to the court; sitting without a jury, extensive findings of fact and conclusions of law were entered, and Phelps Dodge prevailed, recovering both compensatory and punitive damages. Only Lederman has appealed.

He presents six questions for review, five of which include bald assertions of deprivation of constitutional guarantees.[1]

At the outset, we are constrained to point out that appellant's brief reflects substantial lack of compliance with the requirements of Rule 5(b), Rules of the Supreme Court, 17 A.R.S. We recently pointed out that notwithstanding recent amendments of the Supreme Court rule have eliminated certain formal requirements, the requirements of Rule 5(b) have not been eliminated. Mercantile National Life Insurance Co. v. Villalba, 18 Ariz. App. 179, 501 P.2d 20 (1972). Although we agree with appellee's counsel that appellant's opening brief is grossly deficient, we are loathe to penalize appellant by complete rejection. Keplinger v. Boyett, 6 Ariz.App. 514, 433 P.2d 1006 (1967).

Lederman contends that reversible error was committed because of limitation of cross-examination of a witness which "would have afforded him a material defense to the action." The basis of Phelps Dodge's lawsuit was that Lederman and other scrap shippers conspired to defraud and did defraud Phelps Dodge by bribing its employees to "hike" samples from copper-bearing scrap materials shipped by them to Phelps Dodge. This "hiking" activity produced assays showing erroneously high copper content for the samples, which resulted in these shippers being paid for copper not contained in their shipments.

One of the defendants, Humberto Moulinet, was an employee of Phelps Dodge at the Douglas reduction works where it operated a smelter. During the period in question, Moulinet was the melter whose duty it was to heat samples to liquid form and then allow it to solidify into a matter which is then crushed into a fine powder for analysis as to copper content. Moulinet's role in the conspiracy was to "hike" the copper content of the samples of shippers involved in the scheme by adding high-grade copper-bearing material to samples given to him for melting. In April, 1964, suspicions were aroused when one of the samples assayed at over 100 percent copper. Subsequently, several employees of the reduction works observed Moulinet tampering with certain samples which were then checked

<hr />

1. For example, in contending that Phelps Dodge was not justified in relying upon the sample procedure utilized, he states:

"Does due process require reasonable reliance to be proven as a necessary element of an alleged fraud?"

against meltroom records disclosing that they belonged to Lederman and others. The matter was reported to the superintendent who ordered a locker inspection which disclosed high-grade copper material in Moulinet's locker. He thereupon ordered an assay of reserve samples and a comparison of these assays with the assays of samples melted by Moulinet showed great discrepancies. The Moulinet-melted samples were much higher in copper content than the reserve sample assays of the same shipment. Further investigation by Phelps Dodge revealed the fraudulent scheme.

On cross-examination, Lederman's counsel asked Moulinet his reasons for taking money from the shippers for his activity. He stated that he had two reasons, (1) the monetary aspect, and (2) as he stated, "In my personal opinion I don't believe that the procedure of the sample as it went through the brass plant was correct." When asked in what way it was incorrect, he responded that there were "many flaws back and forth that would misrepresent the original sample." Counsel then asked him to tell of one of such errors whereupon opposing counsel interposed an objection on the grounds of immateriality and also lack of foundation. The court then permitted Lederman's counsel to make an offer of proof. His theory was that the samples had been adjusted before they ever reached Moulinet and that the purpose of Moulinet's activities was to equalize the sample. He then proceeded to detail what he proposed to show by the witness as to the adjustment of the sample. This included a description of the activities of other persons with respect to scrap shipments before and during the sampling process which would materially affect the sampling process. He also referred to "continual theft by persons unknown" of usable items of copper from the sampling can due to the fact that these cans were not in an enclosed, protected area. The trial court ultimately sustained the objection of opposing counsel.

■ Counsel made no attempt to point out to the court when these activities took place or that Moulinet either observed or was in a position to observe them. We find no error in the lower court's rejection of the offer of proof since a proper foundation was not laid in sufficient detail. Baker v. Leight, 91 Ariz. 112, 370 P.2d 268 (1962); Hall v. Bannock County, 81 Idaho 256, 340 P.2d 855 (1959).

■ Lederman also contends that Phelps Dodge did not sustain its burden of proof in that it had no right to rely upon its sampling procedure but should also have used "blind samples." (A method of checking on the honesty of employees.) In support of his position, he refers to testimony of the plant superintendent on direct examination to the effect that plant blind samples are commonly used in the ore or metal refining process and that he would expect a company to use such samples as a normal part of its business. He overlooks the fact, however, that this same witness later testified that it was not the custom or practice to use blind samples in the copper industry but only in the branches of the copper business where the smelters received high-grade gold and silver ores. The trial court expressly found that Phelps Dodge had a right to rely on Moulinet's conduct whereby he represented that he was following proper procedure in the sampling process. Appellant has not demonstrated that such finding was clearly erroneous and we therefore accept it as true. Consequently, we reject his contention that a requisite element of fraud was not established.

■ For the same reason, Lederman's argument that the action was barred by the three-year statute of limitations fails since it was based on his contention that Phelps Dodge should have used a blind sample in its sampling procedure. He has pointed up no other evidence to support his contention that Phelps Dodge should have discovered

**110**

the fraudulent activity prior to the time that it in fact did. We therefore find no basis for upsetting the trial court's determination that the statute of limitations did not bar the lawsuit.

█ The trial court's finding that Phelps Dodge was damaged as a consequence of the fraud, admittedly a requisite element, is attacked by Lederman because of what he categorizes as an admission of no damage. This "admission" is testimony of an accountant that there was no shortage in inventories. His argument, however, rests on the erroneous premise that the state of the inventory was relevant to the issue of damages. The trial court apparently concluded that it was not relevant, a matter committed to its discretion. City of Phoenix v. Boggs, 1 Ariz.App. 370, 403 P.2d 305 (1965). We defer to the trial court's ruling in this respect as it is supported by Phelps Dodge's method of keeping its records.[2]

█ We summarily reject Lederman's shotgun-type attack on the fairness of the trial pertaining to admission of exhibits and rulings on requests for admissions. He has not favored this court with either pertinent authority for his position nor reference to the pertinent portions of this voluminous record. We have no duty to search the record to find support for these claimed errors. Tovrea Land & Cattle Co. v. Linsenmeyer, 100 Ariz. 107, 412 P.2d 47 (1966).

Judgment affirmed.

HATHAWAY, C. J., and HOWARD, J., concur.

2. The inventory figure would not disclose the "hiking" activity. Copper was credited to the scrap shippers on the basis of the amount of copper reported by the assay samples and the balance of the smelter production was attributed to ore from Phelps Dodge's Copper Queen branch. Consequently, when the samples were hiked, the records would only reflect less copper credited to the Copper Queen ore and no inventory shortage would be reflected.