688 P.2d 961

William A. KENYON, Jr., the surviving father of Baby Girl Kenyon, on his own behalf, and for and on behalf of Sharon D. Kenyon, the surviving mother of Baby Girl Kenyon; Sharon D. Kenyon and William A. Kenyon, Jr., wife and husband, Plaintiffs-Appellants,

v.

Raymond E. HAMMER, M.D., and Jane Doe Hammer, husband and wife, Defendants-Appellees.

No. 17141–PR.

Supreme Court of Arizona, En Banc.

Sept. 19, 1984.

Leonard & Clancy by James J. Leonard, Jr., Kenneth P. Clancy, Michael J. O'Melia, Phoenix, for plaintiffs-appellants.

Teilborg, Sanders, Haga & Parks by Robert J. Bruno, Frank A. Parks, Steven Plitt, Kathleen A. Nielson, Phoenix, for defendants-appellees.

Snell & Wilmer by John J. Bouma, Robert J. Gibson, Preston H. Longino, Jr., Phoenix, for amicus curiae Arizona Medical Ass'n.

Langerman, Begam, Lewis & Marks by Amy G. Langerman, William B. Revis, Phoenix, for amicus curiae Arizona Trial Lawyers Ass'n.

FELDMAN, Justice.

William A. Kenyon, Jr. and his wife, Sharon D. Kenyon (plaintiffs) brought a medical malpractice action against Raymond E. Hammer, M.D., and his wife (defendants). Defendants moved for summary judgment. The trial court granted the motion and entered judgment for defendants. The court of appeals reversed and defendants petitioned this court for review. The issue presented by the operative facts is whether the statute of limitations for medical malpractice actions (A.R.S. § 12–564(A)) is constitutional as applied to this case. We granted review because of the importance of that legal question. Ariz.R. Civ.App.P., Rule 23(c) 17A A.R.S. After granting review we ordered the parties to file supplemental briefs, set the matter for oral argument and permitted several amici to brief the issue. *Id.* Rule 23(f). We vacate the opinion of the court of appeals, 142 Ariz. 124, 688 P.2d 1016 (App.1983), reverse the judgment of the trial court and hold that the statute violates Article 2, § 13 of the Arizona Constitution. That holding and the opinion which follows are based entirely on state constitutional grounds; federal authority is cited only for the purpose of guidance and not because it compels the result which we reach. *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

## FACTS

Mrs. Kenyon became pregnant with her first child in the late fall of 1971 and came under Dr. Hammer's care in November, 1971. During the course of Mrs. Kenyon's pregnancy, a routine blood test revealed that she had Rh negative blood, but one of Dr. Hammer's nurses erroneously marked her chart to indicate that her blood type was Rh positive. A normal, healthy child with Rh positive blood was delivered on July 10, 1972. If Dr. Hammer had known that Mrs. Kenyon had Rh negative blood he would have administered RhoGAM, a drug which suppresses the immune response which Rh negative mothers may develop to the Rh positive blood cells of their child. To be effective, the drug must be administered within seventy-two hours after delivery of an infant with Rh positive blood. Failure to administer the drug increases the risk of the immune response and the consequent risk to subsequent pregnancy by approximately ten times. Since Dr. Hammer was misled by the information on the chart, the drug was not administered. Mrs. Kenyon did develop the immune response and her ability to bear additional children was, therefore, substantially impaired. Mrs. Kenyon was unaware of this development.

Over five years after the birth of her first child, Mrs. Kenyon again became pregnant. She was delivered of a second child on April 26, 1978. The second baby was stillborn as a result of the destruction of its blood cells by the mother's Rh antibodies; in order to prevent such future tragedies and to protect her own health, Mrs. Kenyon underwent tubal ligation.

On April 30, 1979, one year after the delivery of the second child, plaintiffs filed a two count complaint against defendants.

Both counts are based upon Dr. Hammer's vicarious liability for the alleged negligence of his nurse in incorrectly recording Mrs. Kenyon's Rh factor during the 1971–72 pregnancy. Count I of the complaint sought damages for the wrongful death of the baby; Count II sought recovery of damages for Mrs. Kenyon, including those associated with her second pregnancy, the tubal ligation and the resultant sterility. Defendants moved to dismiss and, in the alternative, moved for summary judgment on the ground that both counts of the complaint were barred by the malpractice statute of limitations, A.R.S. § 12–564(A). The trial court agreed, and granted summary judgment in favor of defendants on both counts.

## WHICH STATUTE APPLIES TO THE DEATH CLAIM?

There are two statutes of limitations which may be applied to the wrongful death claim. The first is the general statute which applies to all wrongful death claims and which provides that an action for wrongful death accrues at the date of death and is barred two years thereafter. A.R.S. § 12–542(2). Plaintiff argues that Count I of the complaint was therefore timely since it was filed within two years from the date of the baby's death. Acknowledging that A.R.S. § 12–542 is the general statute of limitations applicable to wrongful death claims, defendant argues, nevertheless, that all medical malpractice claims, whether for injury or death, are governed by the specific provisions of A.R.S. § 12–564(A), which provides that a "cause of action for medical malpractice against a licensed health care provider accrues as of the date of the injury ..." and, with certain exceptions (*id.*, subsect. B, C, & D) is barred three years thereafter. Defendant claims that whatever the meaning of "date of the injury," the complaint, filed seven years after the negligent act, was untimely if the malpractice statute is applied. The court of appeals held that the action was governed by the wrongful death statute (A.R.S. § 12–542) and that the malpractice statute (A.R.S. § 12–564) applies to actions for "*injuries,* not wrongful death."

142 Ariz. at 128, 688 P.2d at 1020 (emphasis in original). We do not agree.

A.R.S. § 12–542 is a general statute of limitations which, as adopted, applied to all claims for wrongful death no matter what the nature of the underlying claim. A.R.S. § 12–564 is part of the malpractice legislation enacted by the state legislature in 1976 in response to a perceived malpractice crisis. *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977). Enacted later than the wrongful death statute, it was intended by the legislature as a remedial act in response to the difficulties which the medical profession was experiencing in obtaining malpractice insurance. *Id.* at 584, 570 P.2d at 752. We can conceive of no reason why the legislature would have intended such a remedial measure to apply to malpractice claims where there had been injury, but not to malpractice claims where there had been death. It is true that § 12–564 states that it applies to actions for "injury" and does not mention wrongful death claims. However, that statute is a part of Title 12, Chapter 5.1, entitled "Actions Relating To Health Care." The first statute in the chapter, A.R.S. § 12–561, contains definitions applicable to the entire chapter and provides that a " 'cause of action for medical malpractice' means an action for injury or death against a licensed health care provider...." Thus, the word "injury" used in § 12–564(A) with regard to the limitation period for "medical malpractice" actions includes "death" as an "injury."

This analysis compels us to conclude that the applicable limitation period to both the bodily injury claim of Mrs. Kenyon and the wrongful death claim for the death of the Kenyon baby is set forth in A.R.S. § 12–564(A), which provides that a cause of action for medical malpractice must be commenced within three years "from the date of the injury."

## DID THE STATUTE COMMENCE TO RUN AT THE DATE OF INJURY OR THE DATE OF THE NEGLIGENT ACT?

Defendant argues that it was the intention of the legislature to equate "date of

the injury" with "date of the negligent act." Thus, defendant urges that the statute expired three years from the date on which the nurse erred in writing the chart or, at the latest, three years from the date on which the doctor failed to administer RhoGAM. If defendant is correct, the wrongful death claim would have been barred before the baby was conceived and Mrs. Kenyon's bodily injury claim would have been barred before she could possibly have discovered that she had been injured.

Acknowledging that this harsh result is not mandated by the wording of the statute, defendant contends that the issue was decided in *Landgraff v. Wagner*, 26 Ariz. App. 49, 546 P.2d 26 (1976), in which the court of appeals held that the words "date of injury" in the predecessor to the present A.R.S. § 12–564(A) should be interpreted as the date on which the negligent act occurred. *Landgraff* does state such a conclusion, but in *Landgraff*, as in most cases, negligence had produced contemporaneous injury. In the case at bench there was a long hiatus between the time of negligence and, at least in the death case, the time at which injury occurred. We recently noted that *Landgraff* should not be read as broadly as defendant urges. In *DeBoer v. Brown*, 138 Ariz. 168, 170–71, 673 P.2d 912, 914–15 (1983) we held that *Landgraff* stands for the proposition that the legislative intent with regard to the predecessor of the present A.R.S. § 12–564(A) was to limit the discovery rule previously adopted in *Mayer v. Good Samaritan Hospital*, 14 Ariz.App. 248, 482 P.2d 497 (1971), where the court of appeals held that a medical malpractice action accrued, and the statute began to run, on the date that the victim discovered or reasonably should have discovered that he or she had been injured by the negligence of the treating physician.[1]

Defendants contend, nevertheless, that in enacting the present statute the legislature intended to adopt the broad language used in *Landgraff* and equate "date of injury" with "date of the negligent act," thereby creating a "statute of repose." Their analysis of legislative intent may well be justified, but there are compelling reasons that militate against the construction urged by defendant. As we pointed out in *DeBoer v. Brown, supra*, a cause of action cannot be brought until the occurrence of some injury. *Id.* 138 Ariz. at 170, 673 P.2d at 914. To construe A.R.S. § 12–564(A) to bar all actions three years after the date of the negligent act rather than after the date of the injury would require a holding in the death case that the statute ran and the action was barred before it could have been brought—indeed, before the victim was conceived. This result has been permitted in some states. *See, e.g., Carter v. Hartenstein*, 248 Ark. 1172, 455 S.W.2d 918 (1970), appeal dismissed for want of a substantial federal question, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971) (wrongful death); *Rosenberg v. Town of North Bergen*, 61 N.J. 190, 293 A.2d 662 (1972); *Johnson v. Star Machinery Co.*, 270 Or. 694, 530 P.2d 53 (1974) (wrongful death action barred in a products liability context); *Josephs v. Burns & Bear*, 260 Or. 493, 491 P.2d 203 (1971) (property damage); *Yakima Fruit v. Central Heating*, 81 Wash.2d 528, 503 P.2d 108 (1972) (property damage); *but see Condit v. Lewis Refrigeration Co.*, 101 Wash.2d 106, 676 P.2d 466 (1984) (possibly limiting *Yakima Fruit*). These cases, however, are often decided on the premise that the right to bring an action for damages is not protected by the constitution and that the legislature may, therefore, define, abolish and abrogate such rights with impunity so long as it acts reasonably. *Johnson v. Star Machinery Co.*, 270 Or. at 702, 530 P.2d at 57.

A contrary view is taken by many states. For the most part, these are states which contain "open court" provisions in their constitutions. Such provisions typically require courts to be "open" and provide a remedy for injury. *See, e.g.*, Art. I, § 13,

---

1. In speaking of the discovery rule in the remainder of this opinion, we adopt the formulation of the rule set forth in *Mayer, supra*.

Alabama Constitution; Art. I, § 21, Florida Constitution; § 14, Kentucky Constitution; Art. I, § 8, Wyoming Constitution.[2] In many such states the courts view such open court provisions as a requirement that the state provide some remedy for every legally recognized wrong. *Saylor v. Hall,* 497 S.W.2d 218, 222 (Ky.1973); *Daugaard v. The Baltic Cooperative Building Supply Association,* 349 N.W.2d 419 (S.D. 1984). In these states so-called "statutes of repose," which fix the time of accrual as the time of the negligent act (even though no injury occurs and no action can be brought until after the statute has expired), are held to violate the open court provision. *Daugaard v. The Baltic Cooperative Building Supply Association, supra.*[3]

Instead of an open court provision, Arizona has a more specific and stronger requirement. Art. 18, § 6, provides as follows:

> The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

In our view, abolition of a cause of action before injury has occurred, and thus before the action could have been brought, is abrogation, not regulation.[4] *Saylor v. Hall, supra; Kennedy v. Cumberland Engi-*

*neering Company, Inc.,* R.I., 471 A.2d 195, 198 (1984). We agree with the words of the South Dakota court:

> Our constitution ... is solid core upon which all our state laws must be premised. Clearly and unequivocally, our constitution directs that the courts of this state shall be open to the injured and oppressed. We are unable to view this constitutional mandate as a faint echo to be skirted or ignored. Our constitution is free to provide greater protections for our citizens than are required under the federal constitution.... Our constitution has spoken, and it is our duty to listen.
>
> [The statutes] are a locked dead bolt and shackle on our courtroom doors. We are unwilling to couch [these statutes] in wishful language which portends their effect is somehow constitutional. [These] are statutes of nullification which stamp out our citizens' causes of action before they accrue.

*Daugaard v. The Baltic Cooperative Building and Supply Assoc.,* 349 N.W.2d at 425.

■ Given the specific provisions of the Arizona Constitution—stronger than the open court provisions in the Constitution of South Dakota, Florida, North Caroli-

---

**2.** The "open court" provision and the right to sue for damages may have its origin in the Magna Carta. *Lankford v. Sullivan, Long & Hagerty,* 416 So.2d 996, 999 (Ala.1982) (quoting *Fireman's Fund Am. Ins. Co. v. Coleman,* 394 So.2d 334, 350–52 (Ala.1980) (Shores, J., concurring), citing Howard, The Road from Runneymede, and 2 Coke, Institutes.

**3.** The statute "unconstitutionally locked the courtroom door before [plaintiffs] had an opportunity to open it." *Daugaard,* 349 N.W.2d at 424. *See also: Jackson v. Mannesmann Demag Corp.,* 435 So.2d 725 (Ala.1983); *Lankford v. Sullivan, Long & Hagerty, supra* (right to bring cause of action for damages is recognized by the Alabama open court provision; common law actions may not be abrogated by the legislature absent a legitimate social purpose); *Diamond v. E.R. Squibb & Sons,* 397 So.2d 671 (Fla.1981) (a case containing many factual similarities to the case at bench; plaintiff mother had been treated with DES during pregnancy. The drug was later found to cause cancer in female offspring

of such mothers. The condition manifested itself after the child reached the age of puberty. The product liability act contained a ten year statute of repose, which was held unconstitutional under the Florida open court provision); *Overland Construction Co. v. Sirmons,* 369 So.2d 572 (Fla.1979); *Saylor v. Hall,* 497 S.W.2d at 225 (the application of purported limitation statutes in such manner as to destroy a cause of action before it legally exists is not permissible if it destroys a constitutionally protected right of action); *Heath v. Sears, Roebuck & Co.,* 123 N.H. 512, 464 A.2d 288, 294 (1983) (quoting Carson v. Maurer, supra.); *Phillips v. ABC Builders, Inc.,* 611 P.2d 821 (Wyo.1980) (collecting cases); *Bolick v. American Barmag Corp.,* 54 N.C. App. 589, 284 S.E.2d 188 (1981), modified and affirmed, 306 N.C. 364, 293 S.E.2d 415 (1982).

**4.** This was also the view of the court of appeals; it indicated that Article 18, § 6 would forbid the interpretation urged by defendants. 142 Ariz. at 128, 688 P.2d at 1020.

na, Kentucky and Alabama—we believe that any statute which bars a cause of action before it could legitimately be brought abrogates rather than limits the cause of action and offends Article 18, § 6 of the Arizona Constitution. Thus, if we were to give A.R.S. § 12–564(A) the interpretation which defendants contend was meant by the legislature, we would be forced to declare the statute unconstitutional. We need not give the statute such an interpretation for its wording permits— even points toward—the opposite result. We hold, therefore, that as used in the present statute (A.R.S. § 12–564(A)) "date of the injury" means date on which injury occurs and not the date on which the negligent act occurs. If, as is the case here, the patient suffers injury at some time after the negligent act, it is the date of the injury which determines the accrual of the cause of action and it is that date which begins the running of the statute of limitations. Thus, the statute of limitations in this case began to run against Mrs. Kenyon's bodily injury claim on the date on which she suffered some injury. On the wrongful death claim, the statute began to run on the date on which the child suffered some injury.[5] The cause of action was filed in the case at bench within two years from the date the Kenyon baby was conceived. Since A.R.S. § 12–564(A) allows three years from the date of the injury, the wrongful death action is not barred. The trial court erred in dismissing that count of the complaint.

## WHEN DID INJURY OCCUR TO MRS. KENYON?

Plaintiff argues that Mrs. Kenyon received no injury until, at the earliest, the conception of her second baby. Up until that point, according to plaintiff, nothing had happened and the statute of limitations had not begun to run. We disagree.

When her doctor failed to administer Rho-GAM within seventy-two hours of the birth of her first child, Mrs. Kenyon's physical condition changed for the worse because her ability to bear other children was significantly impaired. She became more susceptible to just those problems which later occurred in the case at bench. If the nurse had realized the error four days after the birth of the first child and called Dr. Hammer's attention to the problem, he would have been bound to advise Mrs. Kenyon of the error and to have warned her of the risk of future pregnancy. Greater susceptibility to physical harm has been recognized as an element of damage in Arizona. *Southwestern Freight Lines, Ltd. v. Floyd*, 58 Ariz. 249, 264, 119 P.2d 120, 127 (1941). Certainly, if Mrs. Kenyon had known of her condition and consulted counsel shortly after the birth of her first child, an action could have been brought to recover damages for the decreased ability to bear children or increased risk of fetal fatality. That decreased ability or increased susceptibility is damage which will sustain a cause of action in tort. *Olson v. St. Croix Valley Memorial Hospital, Inc.*, 55 Wis.2d 628, 633, 201 N.W.2d 63, 65 (1972); *see also Southwestern Freight Lines, Ltd. v. Floyd, supra; cf., DeBoer v. Brown, supra* (where there was no change in condition and we found no "injury").

We hold, therefore, that Mrs. Kenyon sustained an injury in July of 1972. That is, therefore, the date on which A.R.S. § 12–564(A) began to run. The parties concede that the Kenyons did not know of the injury and did not become aware of it until the delivery of the second child. At oral argument defendant urged the concept that this was not an undiscoverable injury. We are not persuaded by that argument. From a practical standpoint, we cannot expect a patient to require the physician to deliver up laboratory reports so the patient

5. The record does not permit us to determine whether the fetus was viable at the time it was damaged by the autoimmune response resulting from the failure to administer RhoGAM. We thus do not reach the issue of whether a fetus before or after it becomes viable is a "person" or whether a tort action will lie for injury or death to a fetus before or after it becomes viable. We also do not reach the question of whether a death action may be pursued even though the deceased's action for personal injuries was barred before his death.

can compare them against the doctor's chart to determine if information has been correctly transposed. Nor can we expect the patient to look at the slides and ascertain whether the laboratory has correctly recorded the findings. So far as the record shows, there was neither physical symptom nor abnormality of any type which could have alerted even the most careful individual to the fact that she had suffered some injury. In our view, therefore, this injury was both undiscovered and undiscoverable by even a careful, diligent individual. Nevertheless, as noted (*ante* p. 965) the legislative intent was to abolish the discovery rule or limit it to the situations set out in A.R.S. § 12–564(B), (C) and (D), none of which are applicable to this case. So interpreted, A.R.S. § 12–564(A) bars Mrs. Kenyon's bodily injury claim, unless that statute is for some reason found constitutionally infirm. Plaintiffs have raised and the parties have briefed that argument. We are squarely faced with the constitutional issues.

**6.** Indeed, a survey of Arizona tort law indicates that the discovery rule has been adopted in a great variety of situations. In claims which might qualify as malpractice cases (cases in which defendant breached some duty owed plaintiff by virtue of a special relationship) the discovery rule has been recognized: *Yazzie v. Olney, Levy, Kaplan & Tenner,* 593 F.2d 100 (9th Cir.1979) (applying Arizona law; statute of limitations on tort claims can be tolled by plaintiff's reasonable failure to discover the facts giving rise to those claims); *Sato v. Van Denburgh,* 123 Ariz. 225, 599 P.2d 181 (1979) (action against an accountant); *Long v. Buckley,* 129 Ariz. 141, 629 P.2d 557 (App.1981) (claim against a lawyer); *Russo v. Diethrich,* 126 Ariz. 522, 617 P.2d 30 (App.1980) (cause of action against a surgeon); *Lederman v. Phelps Dodge Corp.,* 19 Ariz.App. 107, 505 P.2d 275 (1973) (cause of action in fraud accrued at the time plaintiff discovered, or should have discovered the fraudulent act); *Walker v. Walker,* 18 Ariz.App. 113, 500 P.2d 898 (1972) (in an action by ward against guardian for conversion, statute begins to run from time ward knew, or should have known, of wrongful act); *Abernethy v. Smith,* 17 Ariz.App. 363, 498 P.2d 175 (1972) (point at which injuries become manifest is important in determining when the cause of action against the physician accrues); *Nielson v. Arizona Title Insurance & Trust Co.,* 15 Ariz.App. 29, 485 P.2d 853 (1971) (cause of action against a title company for negligent misappropriation of funds); *Gibbons v. Badger Mutual Insurance Co.,* 11 Ariz.App. 485, 466 P.2d 36

## CONSTITUTIONALITY—DISABILITY CREATED BY § 12–564(A)

Plaintiff argues that a statute which bars a cause of action even though the victim does not know and cannot discover that an injury exists unfairly discriminates against medical malpractice claimants, placing them under a burden or disability to which other tort claimants are not subjected. It is true that the discovery doctrine has generally been adopted and applied to tort actions in Arizona. *Mayer v. Good Samaritan Hospital, supra* [6]. The statute does, therefore, treat medical malpractice claimants less favorably than other claimants on this issue. We recognize, of course, that the legislature may make reasonable classifications. We acknowledge, also, that malpractice claims are different from most other tort actions and present unique evidentiary problems which may justify a shorter period of limitations than other tort claims. In our view, however, this type of analysis will not support the

(1970) (insured's action based on the alleged negligence of his agent in transferring coverage); *Marsh v. Hawkins,* 7 Ariz.App. 226, 437 P.2d 978 (1968) (action against licensed process server for false return of service of summons); *Lyon v. Great American Insurance Co.,* 4 Ariz. App. 596, 422 P.2d 724 (1967) (statute of limitations against a contractor's surety did not begin to run at time of the negligent act but rather at the time of the owner's occupancy or discovery of the breach). In most cases the discovery rule has been applied as a matter of judicial holding under the provisions of A.R.S. § 12–542, the general statute applying to tort action, which requires the action to be filed within two years after it "accrues." The discovery rule is simply a judicial construction of the word "accrues." The two exceptions to the general tort statute of limitations are A.R.S. § 12–551 and § 12–564. The latter, of course, governs medical malpractice actions while the former pertains to product liability actions and imposes a statute of repose except for claims based on negligence or breach of express warranty. Except for the Death Statute A.R.S. § 12–564, is the only tort statute which contains a legislative definition of the term "accrues"; this is accomplished by triggering the statute on the "date of the injury" instead of the date on which the action "accrues." It is this difference in treatment that plaintiffs find discriminatory.

statute in question. First, we note that the type of claim asserted does not determine the legal classification. This statute does not apply to all malpractice claims, it only applies to those which arise from the provision of health care services. A.R.S. § 12–561(2). Thus, malpractice claims asserted against lawyers, accountants, engineers and other professionals are given different and more favorable treatment. Second, the special treatment is not determined by the nature of the claim. In the case at bench, for example, there is nothing about the claim that falls within the commonly accepted conception of "malpractice." The act of negligence did not involve professional judgment, special skills or training, but only a clerical or mechanical error in transposing information to the office chart. The statute is quite clear; it is not the type of claim which determines special treatment, it is the identity of the person against whom it is asserted. A malpractice claim asserted against an unlicensed health care provider is not covered by the statute (see A.R.S. § 12–561(1)) and, therefore, is within the rule of *Mayer v. Good Samaritan Hospital, supra.* Even if not of the true malpractice variety, a claim falls within the statute if it is made against a licensed health care provider and is "based upon" the defendant's alleged negligent conduct "in the rendering of health care, medical services ... or other health related services." A.R.S. § 12–561(2). Therefore, it seems apparent that this statute imposes a special burden upon a very limited class of tort claimants—those who have claims against licensed health care providers for matters based upon such provider's rendition of health care services (A.R.S. § 12–561(2)), even though from a legal standpoint the claims may not actually be properly denominated as "malpractice claims."

In addition, the statute discriminates internally among the various types of claims against licensed health care providers. The general rule is that the 'action shall be commenced three years "from the date of injury." A.R.S. § 12–564(A). However, if the action involves the claim that a foreign object was left in the patient's body, the statute is tolled until the foreign object is or should have been discovered. *Id.*, subsect. (B). The discovery rule is also retained in cases where the defendant has concealed or misrepresented facts. *Id.*, subsect. (C). A different rule is applied to minors "injured under the age of seven"; in such cases, the statute does not begin to run until the minor becomes seven years of age or dies. *Id.*, subsect. (D).

The statute discriminates in several other ways. The general statutes pertaining to all tort and contract claims contain tolling provisions applicable when the defendant was outside the state at the time the cause of action accrued (A.R.S. § 12–501) or where the person entitled to bring the action was a minor, of unsound mind or imprisoned at the time of accrual (A.R.S. § 12–502). Presumably, A.R.S. § 12–564 renders these provisions inapplicable to those who assert a claim against a licensed health care provider.[7]

## CONTENTIONS

Plaintiffs contend that the special and less favorable treatment accorded them under A.R.S. § 12–564 violates several provisions of the Arizona Constitution. They contend, first, there is a violation of the Arizona "Equal Protection" clause which reads as follows:

No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations.

Arizona Constitution, Article 2, § 13. Plaintiffs also claim that the statute deprives them of their property "without due process of law," in violation of Article 2, § 4. Finally, they claim that by barring the cause of action before it could be asserted the statute offends the abrogation clause of Article 18, § 6 (*see ante*, at 9).

7. "In no event shall the time for commencement of legal action exceed three years from the date of injury except as provided in subsections B, C, and D." A.R.S. § 12–564(A).

78

We believe the equal protection issue is dispositive.[8]

## EQUAL PROTECTION—STANDARD OF REVIEW

All parties agree on methodology appropriate to determine whether the statute violates equal protection. There are three tests available to determine the constitutionality of the act under an equal protection analysis; the task here is to determine the appropriate standard of review.

■ Defendants urge that we adopt the "rational basis" test. This analysis allows greatest leeway to the legislature; it upholds legislative regulation which imposes burdens on one class but not another so long as (1) the court can find some legitimate state interest to be served by the legislation and (2) the facts permit the court to conclude that the legislative classification rationally furthers the state's legitimate interest. *State v. Kelly*, 111 Ariz. 181, 184, 526 P.2d 720, 723 (1974), *cert. denied*, 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975); *Uhlmann v. Wren*, 97 Ariz. 366, 388–90, 401 P.2d 113, 128–29 (1965). Under this "rational basis" test the constitutional requirement of equal protection is violated "only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective." *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). In applying this test, the courts accept the *legislative determination of relevancy so* long as it is reasonable, even though it may be disputed, debatable or opposed by strong contrary arguments. *Vance v. Bradley*, 440 U.S. 93, 111–12, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979); *State v. Arnett*, 119 Ariz. 38, 48, 579 P.2d 542, 552 (1978).

■ A second and intermediate test is known as the "means-scrutiny analysis." We have not yet considered this test under the Arizona Constitution. It has been followed occasionally by the United States Supreme Court, but only in narrow areas involving classifications such as those based upon gender and illegitimacy of birth. *See, e.g., Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion); *Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). To uphold the statute under this test, the court must find the state's interest to be "important" and the means adopted to serve that interest to be "reasonable, not arbitrary" *and* "having a fair and substantial relation to the object of the legislation" so that all persons in similar circumstances "shall be treated alike." *Reed v. Reed, supra*, 404 U.S. at 76, 92 S.Ct. at 254 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920) ). In applying this intermediate test courts must examine more carefully the factual assumptions that underlie the asserted connection between the means adopted by the legislature and the goals which it seeks to achieve. Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications*, 55 Tex.L.Rev. 759, 771–72 (1977).

■ Plaintiffs urge that the proper analysis to be applied is the "strict scrutiny" test. Under this method a discriminatory statute may be upheld only if there is a "compelling state interest" to be served and the regulation is "necessary" to achieve the legislative objective. *See San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981). This strict analysis is not usually applied to social or economic regulation. Defendant contends that it should not be applied here and is properly confined to those cases in which the statute imposes a burden upon a "suspect" classification (e.g. race or reli-

---

8. The concurring opinion takes the position that the guarantee implicit in Article 18, § 6 is so substantial a right that abolition of the dis-covery rule offends the constitutional guarantee. The author does not disagree with this view.

gion) or impinges upon and limits a "fundamental right." (Defendant's brief at 3.) Defendant argues further that there is no suspect classification involved in this case and that the "fundamental rights" factor exists only when the rights affected are "explicitly or implicitly guaranteed by the constitution." *San Antonio Independent School District v. Rodriguez*, 411 U.S. at 33–34, 93 S.Ct. at 1297.

We believe that counsel for the parties and the various amici have correctly identified and characterized the available standards for review. We agree with them that the equal protection issue in the case at bench cannot be resolved absent a determination of which standard is to be applied. Further, we believe that the classification which we deal with in this case does not affect a suspect class. Therefore, determination of the standard of review to be applied is dependent upon an analysis of the nature of the right to bring an action for recovery of damages. If that right is "fundamental," the strict scrutiny analysis must be applied. If the right is not "fundamental," one of the lesser standards is applicable. We proceed, therefore, to consider the nature of the right to bring legal action for recovery of damages.

## IS THE RIGHT TO RECOVER DAMAGES FOR BODILY INJURY A FUNDAMENTAL RIGHT IN ARIZONA?

The creation of rights by tort theory is primarily a matter of state law; the state may create such rights, provide defenses to them and regulate them, except that once such rights have been created and vested the state may not arbitrarily abrogate them.

> [T]he State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the indi-

vidual citizen from state action that is wholly arbitrary or irrational.

*Martinez v. State of California*, 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980).

Thus within the wide limits of federal due process law, states are free to create, define, limit and regulate tort law. This principle would ordinarily give our legislature wide latitude, except that, unlike most states, the legislative prerogative in Arizona is expressly limited by our own organic law. Indeed, the Arizona Constitution is almost unique in its provisions regarding tort law. These provisions were the product of a battle between representatives of mining and cattle interests on the one hand and so-called progressive and labor elements on the other. *See* McGinnis, *The Influence of Organized Labor on the Making of the Arizona Constitution* (1930) (Master's Thesis; Univ. of Ariz., available at Dept. of Archives, State of Arizona); Bakken, *The Arizona Constitutional Convention of 1910,* 1978 Ariz. St.L.J. 1, 2–3.

The relevant provisions include first, in lieu of a general provision requiring the courts to be "open," a specific clause prohibiting abrogation of "the right of action to recover damages ..." and further providing that "the amount recovered shall not be subject to any statutory limitation." Article 18, § 6. The second provision is the Arizona "equal protection" clause contained in Article 2, § 13. Third, the recovery of damages is again protected as follows:

> No law shall be enacted in this state limiting the amount of damages to be recovered for causing the death or injury of any person.

Article 2, § 31.[9]

So that tort immunity could not be established by contract as a condition of labor, the constitution provided:

---

**9.** The prohibition against laws "limiting the amount of damages to be recovered" for death or injury appears in both Article 18, § 6 and Article 2, § 31 of the constitution. Article 18 is the "Labor" article and Article 2 the "Declaration of Rights." This apparent duplication is

not the result of oversight, but derives from hard-fought battles waged on the floor of the constitutional convention of 1910. An examination of the debates is in order. Both of the present constitutional provisions are drawn from Proposition 50 which was introduced at

the convention by delegate Parsons (Dem. Cochise, lawyer). The original proposition read:

It is hereby proposed:

That no law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person. Any contract or agreement [made by] any employee [to] waive any right to recover damages for causing the death or injury of any employee shall be void.

Proposition 50 (on file in the Arizona State Library; bracketed material was inserted prior to proposition being debated on the floor). Apparently the proposition was referred initially to the Committee on Judiciary but was later considered as a labor proposal. When this proposition, aimed primarily at employer-employee situations, was first considered on the convention floor it sparked a lively debate. Delegate Franklin (Dem. Maricopa, lawyer and later State Supreme Court Chief Justice) first spoke on the matter:

I think that this measure should be made not only to include employees but other persons, as in the case of a railroad accident. Should not other persons as well as employees be protected? I would like a little advice on the matter.

Journal of the Constitutional Convention of 1910 [Journal], November 1, 1910, Morning Sess. 18. This sentiment was echoed by delegate Baker (Dem. Maricopa, lawyer, former Justice of the Territorial Supreme Court and later Justice of the State Supreme Court):

... I would like to know why everyone, whether an employee or not, should not be protected in the matter of accident, death or injury? I would not only favor the measure as a protection to employees but I would make it cover all persons who may be included in an accident,—where such persons were subjected to accident, death or injury, as in a railroad accident.

*Id.* At this point delegate Kingan (Rep. Pima, lawyer) rose:

... to offer the following amendment "In Proposition No. 50 as amended, that in line three, on page one, strike out the words, 'made by any employee' and in line four same page, to strike out the words, 'causing the,' [and ']of any employee.[']"

*Id.*, pp. 18–19. Baker asked where the original language had come from. Parsons responded that it was from the Wyoming Constitution. Delegate Cunningham (Dem. Cochise, lawyer) explained the original intent of the proposition:

We understood that this was a measure which considered only the cases where employer and employee were concerned and for this reason we did not take any steps to amend it to include others, as we took it that the original proposition was intended to cover only those who were employees of certain corporations, as the case might be. Amendment by the gentleman from Pima [should be] adopted.

*Id.* Kingan's amendment was adopted (apparently by voice vote) and the convention adjourned until the next day. *Id.*

On November 18th the convention again considered Proposition 50. The special interests of labor were transformed into a general provision to cover all persons. The intent of the convention was clearly to extend the benefits of the right to recover for "accidents, injury or death" to all persons. The battle between the labor delegates and the convention majority was joined again on November 22nd. Proposition 88 ("A Proposition Relative to Employer's Liability") was introduced and debated. Sections 3 ("[n]o waiver by contract of right to recover damages under this Article shall be valid") and 5 ("[t]here shall be no statutory limitation of the amount recoverable as damages in such cases of death or injury by accident as are described in Section 1 of this Article") which would have limited the concept of Proposition 50 to employer-employee situations, were rejected by the convention and replaced by the amended Proposition 50 on a roll call vote of 27 to 19. Journal, November 22, 1910, Afternoon Sess. 10–11. Again the remarks in the debate indicated that the section was to have broad sweep to protect all injured persons, not just injured laborers in certain occupations. *Id.*

When the employer's liability proposition again reached the convention on December 5th former proposition 50 (now Section 3 of proposition 88) was again amended upon the motion of delegate Cunniff (Dem. Yavapai, merchant):

Mr. Cunniff: I should like to offer an amendment to Section 3: "The right of action to recover damages for injuries shall never be abrogated, and the amount recoverable shall never be subject to statutory limitations."
Mr. Jones [Dem.] of Yavapai [a sheepman]: I second the motion.
The motion prevailed.

Journal, December 5, 1910, p. 7. There was no debate. *Id.*

Through the course of the convention, proposition 50 had evolved from a provision to serve the parochial interests of labor to one that stood alone as an expression of the delegates' belief that a right of action for damages was a guarantee to all persons. References to particular industrial contexts and cross-references to other sections of the labor article were removed so that the "no abrogation" provision would clearly reflect its broad intent to protect all. In fact, the original proposition 50 was completely changed by delegate Cunniff's substitution (which is now Art. 18, § 6, Ariz. Const.). This did not escape Cunniff's attention, for he later moved that Proposition 50, as revised and adopted by the convention be included as Section 31 of the declaration of rights article as "a matter of compilation", it having already been adopted in Article 18. Journal, December 5, 1910, p. 2. The motion prevailed apparently by voice vote. *Id.*, Night Sess. Thus, both Art. 2, § 31 and Article 18, § 6 appear today in the

It shall be unlawful for any [employer] ... to require of its servants or employees as a condition of their employment, or otherwise, any contract or agreement whereby such [employer] ... shall be released or discharged from liability or responsibility on account of personal injuries which may be received by such servants or employees while in the service or employment ..., by reason of the negligence of such [employer] ....

Article 18, § 3. To limit judicial interference with damage actions, the following was provided:

The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury.

Article 18, § 5. This provision not only prevents the court from taking the issue from the jury by means of directed verdict or other procedure, but prevents the court from instructing the jury on what they *must* do if they find the defense established by the facts. *Layton v. Rocha,* 90 Ariz. 369, 371, 368 P.2d 444, 445 (1962). Other provisions regarding damage actions were included and pertain to actions by employees against fellow servants and employers. *See* Article 18, §§ 4 & 7.

Numerous cases from other states have considered the problem now before us and have held that the right to bring an action for recovery of damages is not fundamental. Those cases have thus applied the rational basis test and have usually upheld legislation such as that here in question. *See, e.g., Anderson v. Wagner,* 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560 (1979) (collecting cases); *Laughlin v. Forgrave,* 432 S.W.2d 308 (Mo.1968); *Armijo v. Tandysh,* 98 N.M. 181, 646 P.2d 1245 (App. 1981). Some of the states reaching such a decision have open court clauses and some

do not, but none have the abrogation and other provisions cited above from the Arizona Constitution. We find these authorities, therefore, of little assistance in determining the nature of the right to bring an action for damages in Arizona. We do note, however, that even in the absence of such provisions the Supreme Court of New Hampshire concluded that although the right to recover for injuries was not "fundamental" it was "an important substantive right." *Carson v. Maurer,* 120 N.H. 925, 931–32, 424 A.2d 825, 830 (1980). The court therefore applied the intermediate test requiring a showing of a "fair and substantial relation"; being unable to find such a relation, it held portions of the New Hampshire malpractice act, including the special statute of limitations, violated the equal protection clause of the state constitution.

The Montana Supreme Court recently considered a statute which discriminated between ordinary tort claimants and those with claims against governmental entities. Noting that Article II, § 16 of the Montana Constitution guaranteed that all persons be given a "speedy remedy ... for every injury of person, property or character," the court held that the right to recover tort damage was guaranteed by the constitution and was "fundamental." *White v. State,* Mont. 661 P.2d 1272, 1275 (1983). Applying a strict scrutiny analysis, the court held that provisions of the statute which limited the compensable components of injury, including physical pain and suffering, violated the state's equal protection guarantee and were void.

Whatever the rulings in other states, the intent of our constitutional provisions cannot at this date be questioned. The scope of the guarantee provided by the abrogation clause in Article 18, § 6 of the constitution was a matter of some importance in

---

Constitution as fundamental guarantees to the people of Arizona. What happened to the first clause of Article 18, § 6 in "the compilation" which became art. 2, § 31 is not readily apparent from a reading of the Journal. It is obvious, however, that the two provisions were intended to guarantee the same basic right. It is fair to suppose that by curtailing the legislature's pow-

er to limit the amount of damages recovered the convention intended to proscribe legislation which would abolish or abrogate causes of action, since abrogation not only limits the amount recoverable but allows no recovery at all. This was the original intent of Proposition 50, before the clause proscribing abrogation was added by amendment.

the early days of statehood. Did placement of the clause in the "labor" article indicate that the guarantee extended only to the "new" workmen's compensation and employer's liability actions mandated by the other sections of the labor article (Article 18, §§ 7 & 8) or did the guarantee extend to both such actions and common law negligence actions? The first pronouncement from this court on that question came in 1917. The issue was whether the employer's liability statutes enacted in Title 14, Chapter 6 of the Civil Code of 1913 were constitutional. It was argued that the statute was invalid because the legislature had allowed injured workmen to pursue remedies under the employer's liability law, which imposed negligence without fault and restricted common law defenses, but at the same time set no limit to recovery. The defendant claimed that due process was violated by such a procedure unless the amount of recovery was limited by adoption of a "schedule" of benefits. The court held that the statute was not unconstitutional and that the amount of damages to be recovered could not be limited to a "schedule" because of the provisions of Article 18, § 6. *Inspiration Consolidated Copper Co. v. Mendez*, 19 Ariz. 151, 166–67, 166 P. 278, 284–85 (1917). In dissent, Justice Ross argued for a narrow interpretation, contending that the constitutional guarantee contained in Article 18, § 6 did not apply to the "new cause of action" under the employer's liability law which had been passed pursuant to constitutional mandate, but was intended "to apply only to actions of negligence, in which the measure of damages were to be according to the rules of the common law." *Id.* at 172, 166 P. 1183, 1184. Thus, Justice Ross argued that the employer's liability law was a "new liability, [and, unlike common law actions] it was within the power and province of the legislature to fix and regulate it." *Id.* at 170, 166 P. at 1184.

The view of the dissent eventually became the law. The provisions of Article 18, § 6 were construed to apply to and guaran-

tee to all citizens, employees and others, the common law cause of action for negligence. In 1926 this court held that portions of the workmen's compensation act (enacted by the legislature pursuant to the requirement of Article 18, § 8 of the constitution) were void because they deprived injured employees of their common law right to bring a negligence action against their employer unless they had rejected the benefits of the workmen's compensation statute before injury occurred. Although such an election of remedies was not specifically provided for in Article 18, § 8, the defendant argued that the legislature had inherent power to regulate the common law cause of action for damages. Writing for an unanimous court, Justice Alfred Lockwood rejected that contention in the following words:

It is true that the action of negligence was originally a common-law one, but its status was, in our opinion, changed when Article 18, § 6, was adopted. [Quoting language of the abrogation provision] Taken into consideration with the preceding sections 4 and 5 [10] it is beyond question that the 'right of action to recover damages for injuries ...' ... mentioned [in article 18, § 6] is the common-law action of negligence, and that by the prohibition against its abrogation it was taken from its status as one subject to the will of the legislature and imbedded in the Constitution.... Nay, more so, for these last two [workmen's compensation and employer's liability laws] had only constitutional mandates which required positive action on the part of the legislature to make them effective, while *the action for negligence needed no statutory aid, and its principal incidents were placed beyond legislative control.*

... The common law action of negligence, as modified by the constitution, is now as much 'provided' by that instrument for the *benefit of all, be they employees or others,* as are the Employers'

---

**10.** [Article 18, §§ 4 and 5, abolishing fellow servant doctrine and requiring defenses of con- tributory negligence and assumption of risk to be left to the jury].

Liability Law or the Compensation Act, for certain classes of employees, and no statute can take away the right to pursue it without granting a reasonable election to all who, on the facts, are entitled to it.

*Alabam's Freight Co. v. Hunt*, 29 Ariz. 419, 443–44, 242 P. 658, 665–66 (1926) (emphasis supplied); *see also Moseley v. Lily Ice Cream Co.*, 38 Ariz. 417, 420, 300 P. 958, 959 (1931) (holding that the "former common-law action for negligence [is] a constitutional one, and that it cannot be abrogated by the legislature"); *Morrell v. City of Phoenix*, 16 Ariz. 511, 517, 147 P. 732, 735 (1915) (Ross, J., holding that Article 18, § 6 applied only to rights "cognizable by law" at the time the constitution was adopted; Franklin, J. concurred).

These cases should resolve the issue since defendants acknowledge, as they must, that a "fundamental right" has generally been defined as a right "explicitly or implicitly guaranteed by the constitution." *San Antonio Independent School District v. Rodriguez*, 411 U.S. at 33–34, 93 S.Ct. at 1297. Defendants argue, however, that this court has already ruled that the malpractice act did not affect fundamental rights and should, therefore, be governed by the rational basis test, citing *Eastin v. Broomfield, supra*. We disagree with defendant's analysis of *Eastin*. In *Eastin* we upheld many portions of the act, but did not consider the statute of limitations. The panel "screening" procedure, the admission of the panel's findings as evidence at the subsequent trial, and the abolition of the collateral source rule were upheld by applying a rational basis test. These portions of the statute do not affect the essence of the fundamental right to bring a lawsuit; they merely regulate what is done with the action after it is brought and prescribe the procedure to be followed before trial and the admission of evidence at trial. *See Phoenix General Hospital v. Superior Court*, 138 Ariz. 504, 675 P.2d 1323 (1984). It is one thing to hold that the right to bring a cause of action is guaranteed in the constitution, free from legislative control (*Alabam's Freight Co., supra*), but entire-

ly different to hold that the constitution also requires that we continue to follow the same rules of pleading, procedure and evidence that existed in 1912. The latter proposition is not required by the former nor recognized by any authority cited to us. *Eastin* correctly applied the rational basis test to those portions of the statute which did not affect the fundamental right to bring the action. We did consider a portion of the statute which affected the right to pursue the action—the requirement of a $2,000 cost bond as a *sine qua non* of proceeding with the action after an unfavorable decision from the screening panel. We held that the bond requirement violated the constitution "by denying access to the courts" to indigents. *Eastin*, 116 Ariz. at 586, 570 P.2d at 754. We further held the bond requirement unconstitutional for non-indigents because it placed "a heavier burden upon [their] access to the court." *Id. Eastin* therefore stands for the proposition that where the fundamental right to bring or pursue the action is affected, this court will not apply the rational basis analysis.

■ We hold, therefore, that the right to bring and pursue the action is a "fundamental right" guaranteed by Article 18, § 6 of the constitution and the other provisions cited *ante* at 971. Therefore, the provisions of A.R.S. § 12–564, which discriminate against those with claims against licensed health care providers as distinguished from all other malpractice claims, and which also discriminate internally between classes of medical malpractice claimants, must be tested under the strict scrutiny analysis. The abolition of the discovery rule for some medical malpractice claimants is valid only if it serves a compelling state interest and is necessary to the attainment of that interest. We proceed, therefore, to consider these final two points.

### IS THERE A COMPELLING STATE INTEREST?

Plaintiff and amicus Arizona Trial Lawyers Association argue that there was no

real malpractice crisis but merely hysteria engendered by a rise in premiums charged by insurance companies. They claim that the "crisis" was neither real nor connected to results in malpractice cases tried in Arizona. Alternatively, they argue that even if the crisis was real, it no longer exists and cannot be used as a basis to sustain the unequal treatment mandated by the statute. Authority to support that proposition is to be found in *Arneson v. Olson*, 270 N.W.2d 125, 136 (N.D.1978) and *Boucher v. Sayeed*, R.I., 459 A.2d 87, 92–93 (1983).

In *Eastin, supra*, we described the evidence before the legislature at the time of the enactment of the statute. We noted the sharp increase in malpractice insurance premiums in Arizona and concluded as follows:

> By providing a system whereby the meritorious claims could be separated from the frivolous ones prior to trial and pretrial settlements would be encouraged, the Act promoted a *legitimate* legislative purpose.

116 Ariz. at 583, 570 P.2d at 751 (emphasis supplied). We abide by our previous finding, but note that partial abolition of the discovery rule in medical malpractice claims has little relevance to promoting meritorious claims and discouraging frivolous ones, nor in promoting settlement or decreasing the cost of litigation. Nor do the internal distinctions in the statute help sustain it. It is hard to envision why claims of a six year old child are likely to be more meritorious than those of children over seven. The act under consideration abolishes the discovery rule for many types of claims against health care providers, no matter how meritorious the claim. It is difficult to find a compelling or even legitimate interest in this. It may be argued, of course, that the high premiums in malpractice cases work an economic hardship on physicians and that, therefore, the special statute of limitations should be sustained as a necessary "relief measure" for health care providers. We doubt the factual premise for such an argument. More importantly, however, we believe that the state has neither a compelling nor legitimate interest in providing economic relief to one segment of society by depriving those who have been wronged of access to, and remedy by, the judicial system. If such a hypothesis were once approved, any profession, business or industry experiencing difficulty could be made the beneficiary of special legislation designed to ameliorate its economic adversity by limiting access to the courts by those whom they have damaged. Under such a system, our constitutional guarantees would be gradually eroded, until this state became no more than a playground for the privileged and influential. We believe this is exactly what those guarantees were designed to prevent. Special privileges and immunities are not favored by Arizona law. *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597 (1982).

In our view, therefore, under an equal protection analysis the compelling interest of the state in reducing malpractice premiums must be found, if at all, in the state's interest in making quality medical care available to the public at reasonable cost. The compelling state interest in the case at bench can be found only in the state's interest in decreasing the costs of medical care or increasing the availability of medical services. Assuming, as is argued in the amicus brief of the Arizona Medical Association (p. 21), that this was the broad goal sought by the malpractice act and that the state's interest was, therefore, compelling, we proceed to consider whether the specific statute here under consideration is necessary to reach *that* objective.

## NECESSITY

Determination of necessity requires consideration of facts. These may be "adjudicative" facts developed in the case or "legislative facts" which are defined as "established truths, facts or pronouncements that do not change from case to case." *Boucher v. Sayeed, supra.* 459 A.2d at 92 (citing *United States v. Gould*, 536 F.2d 216, 219–20 (8th Cir.1976) and McCormick, *Evidence*, § 328 at 759, § 331 at 766–67 (2d ed. 1972)). The facts here are few, but telling. The

statute has been in effect nine years. So far as the record shows, malpractice premiums have not declined and health care costs have increased to the crisis point. We do not know what the cost of malpractice coverage adds to individual patients' costs in a doctor's office, but a recent case indicates that the average cost of care in California hospitals has risen markedly in the last decade. It was $217 per patient day in 1975, had climbed to $547 per patient day in 1981 and to $620 per patient day in 1982. *American Bank and Trust Co. v. Community Hospital*, 33 Cal.3d 674, 190 Cal.Rptr. 371, 382, 660 P.2d 829, 840 (1983), rehearing granted June 15, 1983, opinion on rehearing at 36 Cal.3d 359, 204 Cal.Rptr. 671, 683 P.2d 670 (1984).[11] We assume Arizona figures are lower but roughly comparable. *See Arizona Daily Star*, June 19, 1984, page 2B; "Health Care Cost Containment: A Briefing Paper," Research Staff, Arizona House of Representatives, Table 3, p. 14 (June, 1984). We are cited to no facts that support the idea that such increases are attributable to malpractice premiums. *See id.*, p. 5. Statistics cited in *American Bank, supra,* indicate that the enactment of the malpractice act in California reduced the cost of malpractice coverage by one dollar per patient per day. In light of a present cost of $620 per patient per day, a $1.00 reduction, even if entirely attributable to the existence of the malpractice act, seems insignificant and irrelevant to the problem.

We acknowledge that "actuarial uncertainty," aggravated by the discovery rule and the narrow premium base, could contribute to the cost of malpractice coverage. *Harrison v. Schrader*, 569 S.W.2d 822, 826 (Tenn.1978). Assuming, *arguendo*, that this is true, it may also be assumed that the legislature intended to halt the increase in malpractice premiums in order to accomplish twin goals of reducing the cost of care to patients and preventing the reduc-

tion in availability of such care which might occur if some health care providers were discouraged from practice by high premiums. *Id.* The question then is whether the abolition of the discovery rule is necessary to reduce malpractice premiums. It has been held that shortening the statute of limitations to the extent that claims are barred before they can reasonably be brought is neither rationally nor substantially related to such a goal and is so unreasonable and arbitrary that it violates the equal protection provisions of various state constitutions. *Schwan v. Riverside Methodist Hospital*, 6 Ohio St.3d 300, 301–02, 452 N.E.2d 1337, 1339 (1983) (holding that even though the right to bring an action is not "fundamental" under the Ohio Constitution, the statute's internal classifications between minors above and below the age of ten were not rationally related to a legitimate legislative objective and thus violated equal protection);[12] *cf.* subsections (B), (C) and (D), of A.R.S. § 12–564; *Clark v. Singer*, 250 Ga. 470, 472, 298 S.E.2d 484, 486 (1983) (finding "no rational basis for a limitation scheme which permits a medical malpractice wrongful death action if the patient dies within two years of the defendant's negligent act but which bars [it] if the patient lives for two years [and then dies] ... where the defendant is a doctor but not in other wrongful death cases"); *Tafoya v. Doe*, 100 N.M. 328, 670 P.2d 582, 585 (App. 1983) (treating a notice statute for claims against the state as a statute of limitations and holding that equal protection was violated when the notice statute was applied to minors who could not reasonably be expected to file notice of injury within one hundred and twenty days). In *Carson v. Maurer, supra,* the court held:

> [the statute] is invalid insofar as it makes the discovery rule unavailable to all medical malpractice plaintiffs except those whose actions are based upon the discovery of a foreign object in the in-

---

**11.** Since rehearing was granted, we do not cite the case as legal authority, but only as secondary authority for the statistics cited.

**12.** *Schwan* overrules *Vance v. St. Vincent Hospital*, 64 Ohio St.2d 36, 414 N.E.2d 406 (1980); *but see Opalko v. Marymount Hosp., Inc.*, 9 Ohio St.3d 63, 458 N.E.2d 847 (1984) (saving the remainder of the statute).

jured person's body.... [Our decisions] made it clear ... that the [discovery] rule and the fundamental equitable considerations underlying it applied to medical malpractice cases generally. [citation omitted]. As such, the legislature may not abolish the discovery rule with respect to any one class of medical malpractice plaintiffs.

120 N.H. at 936, 424 A.2d at 833.

The New Hampshire Court also stated: We also find [the statute] unconstitutional insofar as it extinguishes [the tolling provisions usually applicable to minors or incompetents].... *The legislature may not, consistent with equal protection principles, deny only this class of medical malpractice plaintiffs the protection afforded all other persons by the [tolling] statute.* [citation omitted]. *In doing so,* [the statute] *does not substantially further the legislative object of containing the costs of the medical injury reparation system* because the number of malpractice claims brought by or on behalf of minors or mental incompetents is comparatively small. [citation omitted] At the same time, the statute operates to extinguish a cause of action of which the plaintiff, due to his disability, may not have learned until after the limitations period has expired. [The statute] unfairly burdens and discriminates against medical malpractice plaintiffs, and we therefore hold that it denies such plaintiffs equal protection of the laws.

*Id.* at 936–37, 424 A.2d at 833–34 (emphasis supplied); *see also* Jenkins, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge,* 52 S.Cal.L.Rev. 829, 960–61 (1979); *Heath v. Sears, Roebuck & Co.,* 123 N.H. at 522, 525, 464 A.2d at 288, 293–94 (holding that abolition of discovery rule and enactment of a statute of repose for product liability actions were not substantially related to the legislative objective of reducing product liability insurance rates since there was no evidence that such enactments would bring about a reduction in rates and consequent reductions in prices of products).

We need not, however, rely only on authority in reaching a conclusion about the lack of relationship between the statute and the goal which it was intended to achieve. The parties seem to agree that the statistics contained in the *Report of the Secretary's Commission on Medical Malpractice, supra* at 254, indicate that over 88% of all medical malpractice injuries which result in claims are reported within the first two years following injury, that 95 to 96% of all claims have been reported within three years, 97% within four years and only 2% are unreported after five years. ATLA Amicus Brief at 3; defendant's supplemental brief at 17; *see also* S. Law and S. Polan, *Pain and Profit: The Politics of Malpractice* 122–23 (1978), quoting the National Association of Insurance Commissioners study of claims paid from July of 1975 through June of 1976. These statistics indicate to us that the "long tail" caused by the discovery rule is not a significant portion of the problem. If prompt actuarial certainty is required, reduction of the statute of limitations would have been a much more rational method of achieving the compelling state interest than abolition of the discovery rule and consequent abrogation of the few and unusual claims where, because of lack of knowledge or disability, the claimant was unable to bring the action within the flat time limits.

No evidence is provided in the record and none has been cited by any party that would support the necessity of the legislative discrimination between malpractice claimants with undiscoverable injuries and those who are injured before they are seven years of age, or between the former and those claimants whose actions are based upon foreign object claims. There are distinctions, but under the strict scrutiny test the mere existence of distinguishing factors is not sufficient and we are not permitted to assume the necessary relationship between means and goals. To satisfy the strict scrutiny standard, the state must show that the statute is necessary to achieve the compelling state interest; one test recently described for "necessity" is that the statute furthers the compelling

interest "by the least restrictive means practically available." *Bernal v. Fainter,* — U.S. ——, ——, 104 S.Ct. 2312, 2320, 81 L.Ed.2d 175 (1984).

Given these statistics, and the lack of either legislative or adjudicative record to demonstrate the effect that the abolition of the discovery rule may have on malpractice premiums, we cannot find the requisite showing that the abolition of the discovery rule was a necessary step to achieve the compelling state interest in reducing the cost of medical care or increasing the availability of such care. Under the strict scrutiny test such a showing must be found from legislative or adjudicative facts and not from hypothesis, speculation or "deference" to some unspecified legislative conception. *Boucher v. Sayeed, supra.* There is an even greater lack of facts to support the hypothesis that the abolition of the discovery rule was the "least restrictive means practically available" to achieve the legislative goal of reducing premiums, thus making medical services less costly and more available.

Even assuming a compelling state interest exists, we hold, therefore, that the imposition of an absolute bar three years from the date of injury on most—but not all—medical malpractice claimants, the abolition of general tolling provisions recognized for all other tort claims and the internal distinctions between classes of medical malpractice claimants, all discriminate against and among medical malpractice claimants in a manner which infringes upon fundamental rights. A.R.S. § 12–564, therefore, violates equal protection (*White v. State, supra*) and we hold it unconstitutional under Article 2, § 13 of the Arizona Constitution insofar as it purports to abolish or limit the discovery rule in medical malpractice cases. The three-year statute of limitations of A.R.S. § 12–564 will remain in effect except that the courts of this state shall follow the discovery rule as set out in *Mayer v. Good Samaritan Hospital, supra.*

We emphasize that this holding is based upon a finding that no demonstrated necessity existed for the legislative enactment. The problem of the "long tail" which may be created by the discovery rule seems to have been of little significance and much more susceptible of being handled by other measures, such as shortening of the statute of limitations for medical malpractice cases or regulation of insurance premiums and procedures, than by abolition of the discovery rule. Our holding today does not take from the legislature the power to regulate by enacting statutes of limitation. It may well be that medical malpractice claims, as a class, are sufficiently different from other claims or create such different social and economic problems that the legislature may set a different limitation period for such claims than for other malpractice claims or other tort claims in general. Classification of claims for limitation purposes has traditionally been a legislative prerogative; we do not disturb that prerogative. It is one thing, however, to regulate by classification in setting up reasonable periods within which to bring an action, and it is another thing to confer a special privilege upon one class of defendants by effectively abolishing the opportunity for those with even the most meritorious claims to assert them. When the legislature undertakes the latter, it impinges upon the fundamental rights guaranteed by our state constitution and it then becomes the duty of this court to declare such actions void under that constitution.

The judgment of the trial court is reversed. The opinion of the court of appeals is vacated. The case is remanded for further proceedings consistent with this opinion.

CAMERON, J., concurs.

Note: Vice Chief Justice FRANK X. GORDON, Jr. did not participate in the determination of this matter.

HAYS, Justice, specially concurring:

I concur in the result reached by the majority but my reasoning is less convoluted and perhaps more simplistic than that in the majority opinion. In essence, it is my

88

opinion that the right to bring an action in Arizona is, under our constitution, a fundamental right. Ariz. Const. art. 18, § 6. A statute of limitations or repose which abrogates an action for damages even before the action arises or can reasonably be discovered is unconstitutional.

This court, in *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977), found a portion of the Medical Malpractice Act requiring a bond, A.R.S. § 12–567(K), to be unconstitutional because it placed a heavy burden on access to the courts and violated the privilege and immunities clause of the Arizona Constitution. Although the article of the constitution cited applies to equal privileges and immunities (art. 2, § 13), the parallel is apparent.

I concur with the majority's holding that the three-year statute of limitations of A.R.S. § 12–564 will remain in effect except that the courts of this state shall follow the discovery rule as set out in *Mayer v. Good Samaritan Hospital*, 14 Ariz. App. 248, 482 P.2d 497 (1971).

HOLOHAN, Chief Justice, concurring: I concur in the special concurrence.