IN THE

# SUPREME COURT OF THE STATE OF ARIZONA
────────────

**ROBERTO TORRES, ET AL.,**
*Plaintiffs/Appellees,*

*v.*

**JAI DINING SERVICES (PHOENIX), INC.,**
*Defendant/Appellant,*
────────────

No. CV-22-0142-PR
Filed October 16, 2023
────────────

Appeal from the Superior Court in Maricopa County
The Honorable Sherry K. Stephens, Judge (Retired)
No.CV2016-016688
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
253 Ariz. 66 (App. 2022)
**VACATED**
────────────

COUNSEL:

David L. Abney (argued), Ahwatukee Legal Office P.C., Phoenix; Robert F. Clarke, Clarke Law Offices, Phoenix; and Matthew D. Koglmeier, Koglmeier Law Group PLC, Mesa, Attorneys for Roberto Torres, Orlenda Guillen, Hernan Gastelum Rosas, and Maria Suarez

Eric M. Fraser (argued), Andrew G. Pappas, Osborn Maledon P.A., Phoenix; and Dominique Barrett, Quintairos, Prieto, Wood & Boyer P.A., Scottsdale, Attorneys for JAI Dining Services (Phoenix), Inc.

Daniel Rubinov, Rafat H. Abdeljaber, RAJ Law PLLC, Phoenix, Attorneys for Amici Curiae Arizona Association for Justice/Arizona Trial Lawyers Association

Amanda Heitz, Lauren Walter, Bowman and Brooke LLP, Phoenix, Attorneys for Amicus Curiae Arizona Association of Defense Counsel

Camila Alarcon, Alarcon Law & Policy, P.L.L.C., Phoenix, Attorney for Amicus Curiae Arizona Restaurant and Hospitality Association

Peter H. Schelstraete, Schelstraete Law Office, Tempe, Attorney for Amicus Curiae Arizona Licensed Beverage Association

Richard P. Traulsen, Begam Marks & Traulsen P.A., Phoenix, Attorney for Amicus Curiae Mothers Against Drunk Driving (MADD Arizona Chapter)

Mick Levin, Alexandra Van Duffelen, Mick Levin P.L.C., Phoenix; and Noah J. Van Amburg, Van Amburg Law Firm, P.L.L.C., Tucson, Attorneys for Amicus Curiae Homicide Survivors, Inc.

Michael G. Bailey, Arizona Chamber of Commerce, Phoenix, Attorney for Amicus Curiae Arizona Chamber of Commerce

––––––––––––––

CHIEF JUSTICE BRUTINEL authored the Opinion of the Court, in which JUSTICES BOLICK, LOPEZ, and BEENE joined. JUSTICE BOLICK issued a concurring opinion. VICE CHIEF JUSTICE TIMMER dissented.[*]

––––––––––––––

CHIEF JUSTICE BRUTINEL, Opinion of the Court:

¶1        The Arizona Constitution guarantees that "[t]he right of action to recover damages for injuries shall never be abrogated." Ariz. Const. art. 18, § 6. This case requires us to consider whether that "anti-abrogation clause" extends to rights of action created after our constitution was ratified, and more specifically, whether the anti-abrogation clause prevents the legislature from limiting the common law dram-shop action recognized in *Ontiveros v. Borak*, 136 Ariz. 500 (1983), which imposed tort liability upon liquor licensees that cause harm by overserving their patrons. We hold the anti-abrogation clause does not extend to dram-shop actions because they were recognized after statehood.

––––––––––––––

[*] Justice William G. Montgomery and Justice Kathryn H. King have recused themselves from this case.

## I. BACKGROUND

¶2            After a night of heavy drinking at the Jaguars Club in Phoenix, Cesar Aguilera Villanueva drove away heavily intoxicated. *Torres v. JAI Dining Servs. (Phx.) Inc.* (*Torres I*), 252 Ariz. 28, 29 ¶¶ 1–2 (2021). After going to a friend's house to "sober up" and sleeping for a short time at his own house, Villanueva again drove and crashed into a car stopped at a red light, killing its two occupants, Guadalupe Gastelum Suarez and Jesus O. Torres Guillen. *Id.* ¶¶ 3–4.

¶3            The victims' families, Roberto Torres et al. ("Plaintiffs"), sued Villanueva for negligence and sued JAI Dining Services ("JAI"), the owner of Jaguars Club, under theories of statutory and common law dram-shop liability.[1]  *Id.* at 30 ¶ 5.  At trial, the jury found Villanueva liable for negligence but rendered a split verdict on the dram-shop claims against JAI. *Id.* ¶ 6.  The jury found JAI was liable under the common law dram-shop action recognized by this Court in *Ontiveros*, which imposes liability on a liquor licensee that serves alcohol to an intoxicated patron if it "know[s] or should know that such conduct creates an unreasonable risk of harm to others." *Id.*; *Ontiveros*, 136 Ariz. at 513.  However, the jury found JAI was *not* liable under the dram-shop cause of action codified at A.R.S. § 4-311(A), which imposes liability on a liquor licensee that serves alcohol to a patron who is "obviously intoxicated." *Torres I*, 252 Ariz. at 30 ¶ 6; § 4-311(A)(1). The jury awarded Plaintiffs $2 million in damages, apportioning 40% of the fault to JAI. *Torres I*, 252 Ariz. at 30 ¶ 6.

¶4            When this case was previously before us, we vacated the court of appeals' decision, which had found that an intervening and superseding cause—Villanueva's "decision to resume driving after reaching home"—had broken the chain of proximate causation and relieved JAI from liability for Villanueva's actions. *Id.* ¶¶ 1, 20.  We disagreed and found the jury "could have reasonably concluded that Villanueva's act in driving while intoxicated, even after he reached home . . . was nevertheless foreseeable by someone in [JAI's] position and not extraordinary in hindsight." *Id.* at 32 ¶ 18. We remanded and instructed the court of appeals to consider whether JAI had waived its separate argument that § 4-312(B), which bars dram-shop claims not raised under § 4-311, preempted the common law dram-

---

[1]  A dram shop is "[a] place where alcoholic beverages are sold; a bar or saloon." *Dram Shop*, Black's Law Dictionary (11th ed. 2019).

shop action recognized in *Ontiveros*. *Torres I*, 252 Ariz. at 32–33 ¶¶ 19–20. If not waived, we instructed the court to decide the preemption question. *Id.*

**¶5** On remand, the court of appeals found that, although JAI did not make its preemption argument to the trial court, both parties "had ample notice and multiple opportunities" to argue this issue, and an exception to the waiver doctrine was warranted because the case was an "appropriate vehicle" to consider this recurring issue. *Torres v. JAI Dining Servs. (Phx.), Inc.* (*Torres II*), 253 Ariz. 66, 71–72 ¶¶ 15–16 (App. 2022).

**¶6** On the merits, the court of appeals found that § 4-312(B) "expressly preempts" Plaintiffs' common law dram-shop claim and that such preemption "does not run afoul" of the anti-abrogation clause. *Id.* at 69 ¶ 2. To arrive at this conclusion, the court read our most recent decisions interpreting the clause, *Cronin v. Sheldon*, 195 Ariz. 531 (1999) and *Dickey ex rel. Dickey v. City of Flagstaff*, 205 Ariz. 1 (2003), to hold "that if a plaintiff could not have asserted a claim for a particular type of harm against a particular defendant in 1912, then the anti-abrogation clause provides that claim no protection." *Id.* at 75 ¶ 31. And based on our holding in *Ontiveros*, which "abolished the common law doctrine of tavern owner nonliability in Arizona," *id.* at 72 ¶ 19, the court concluded dram-shop actions "could not have been maintained at the time the anti-abrogation provision was instituted" and are subject to abrogation. *Id.* at 76 ¶ 32 (quoting *Dickey*, 205 Ariz. at 5 ¶ 18). The court therefore held that the anti-abrogation clause did not preclude the legislature from "expressly preempt[ing] the common law liability created by *Ontiveros* . . . and replac[ing] it with a more clearly defined statutory liability scheme." *Id.* at 77 ¶ 38. The court acknowledged that its holding conflicted with an earlier decision that had found § 4-312(B) unconstitutionally abrogated the dram-shop action recognized in *Ontiveros*, *id.* ¶ 37 (discussing *Young v. DFW Corp.*, 184 Ariz. 187 (App.1995)), but found that *Young*'s analysis "was error" and "cannot be good law after *Dickey*." *Id.* The court therefore reversed the "portion of the superior court's judgment against JAI and remand[ed] for that court to enter judgment in favor of JAI and in favor of Plaintiffs only as to Villanueva." *Id.* ¶ 39.

**¶7** Plaintiffs timely petitioned for review. JAI also asked us to review the issue and settle the conflict between *Young* and *Torres II*. We granted review, asking the parties to address whether the anti-abrogation

clause only extends to common law rights of action that could have been brought at the time of statehood, or if it instead covers all common law rights of action regardless of when they were recognized. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and review this constitutional issue de novo. *State v. Mixton*, 250 Ariz. 282, 285–86 ¶ 11 (2021).

## II.     DISCUSSION

**¶8**        Our caselaw squarely answers the question at hand. Because the anti-abrogation clause only applies to rights of action that either "existed at common law" or find their "basis in the common law at the time the constitution was adopted," *Dickey*, 205 Ariz. at 3 ¶ 9, the clause does not preserve the dram-shop action first recognized in *Ontiveros*. Although contradictory dicta can be found in a few of this Court's cases—namely, *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 17–18 (1986) and *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 343–44 (1993)—this Court has never extended the anti-abrogation clause to rights of action not recognized at statehood, and we will not do so now. Below, we first discuss our caselaw interpreting the clause and the standard guiding an anti-abrogation analysis, and then analyze whether dram-shop actions are protected by the anti-abrogation clause.

## A.  The Anti-Abrogation Clause.

**¶9**        Throughout over a century of jurisprudence, this Court has never extended the anti-abrogation clause's protections to rights of action incognizable at statehood. Rather, we have consistently rejected arguments asking us to do so. For instance, in *Morrell v. City of Phoenix*, 16 Ariz. 511 (1915), we found that a city charter immunizing the City of Phoenix from certain tort liability did not violate the anti-abrogation clause, stating the clause "only undertakes to *preserve rights already cognizable by law*, and does not undertake to create new rights of action." *Id.* at 517 (emphasis added). We held that the required election of remedies under Arizona's worker's compensation law, whereby an injured employee can either sue an employer for negligence or relinquish the ability to sue for negligence by accepting compensation for injuries under the statutory scheme, does not offend the anti-abrogation clause. *E.g.*, *Moseley v. Lily Ice Cream Co.*, 38 Ariz. 417, 421 (1931). And we have held that the clause does not extend to new "actions created by the legislature." *Boswell*, 152 Ariz. at 14 (discussing this holding from *Alabam's Freight Co. v. Hunt*, 29 Ariz. 419, 443–44 (1926)).

¶10　　　　One particularly instructive case is *Industrial Commission v. Frohmiller*, 60 Ariz. 464 (1943), where this Court held that a statutory limitation on the damages recoverable for injuries caused by occupational diseases was not prohibited by the anti-abrogation clause because "there was no common law right of action for occupational disease" at statehood. *Id.* at 471. The Court acknowledged that, "[i]f the right to recover damages or compensation under the common law for injury caused by occupational disease existed at the time [the anti-abrogation clause was] adopted," the defendant's argument that the challenged law violated the anti-abrogation clause "would have some force." *Id.* at 468. But based upon the Court's review of pre-statehood common law decisions and the fact that "no case [had] ever come to this [Court] asking for damages solely upon the ground of occupational disease," we concluded the anti-abrogation clause did not extend to the right of action to sue for injuries caused by occupational disease. *Id.* at 470–71.

¶11　　　　Our older caselaw accords with our most recent cases on this topic, *Cronin* and *Dickey*, in which we emphasized that the anti-abrogation clause does not "extend constitutional protection to all tort causes of action, whenever or however they may have arisen." *Cronin*, 195 Ariz. at 539 ¶ 36. In *Cronin*, we found that an action for wrongful discharge in violation of public policy—a right of action created by statute in 1965, *id.* at 533 ¶ 1—was unprotected by the anti-abrogation clause because it "originate[d] exclusively within the statute, would not otherwise exist, and cannot trace its antecedents to a common law right of action." *Id.* at 539 ¶ 39.

¶12　　　　Similarly, in *Dickey*, we found that "to fall within the protection of the anti-abrogation provision of the Arizona Constitution," a right of action "must have existed at common law or have found its basis in the common law at the time the constitution was adopted." 205 Ariz. at 3 ¶ 9. The *Dickey* Court examined whether a recreational-use statute (which limited tort liability for cities that allowed the public to use land for recreational purposes) violated the anti-abrogation clause. *Id.* at 2 ¶ 5. The Court found that, at statehood, "cities engaged in governmental functions were not subject to liability for negligence," *id.* at 3 ¶ 10, and that the defendant city was performing a governmental function by holding the land "open to the public for recreational use." *Id.* at 6 ¶ 23. Thus, because the city "would have been immune at common law [in 1912] from tort liability for acts of ordinary negligence" pertaining to public uses of

recreational land, the recreational-use statute's limitation on tort liability did not violate the anti-abrogation clause. *Id.*

**¶13** As such, consistent with our duty to faithfully apply precedent unless "the reasons for it" no longer exist or it is "clearly erroneous or manifestly wrong," *State v. Agueda*, 253 Ariz. 388, 392 ¶ 20 (2022) (quoting *Lowing v. Allstate Ins.*, 176 Ariz. 101, 107 (1993)), we reaffirm the rule stated in *Dickey*: The anti-abrogation clause only prohibits abrogation of rights of action that existed at statehood or that are based in rights of action existing at statehood. *See Dickey*, 205 Ariz. at 3 ¶ 9. This rule does not render the anti-abrogation clause toothless: "[w]ithout limitation it confers the right to recover damages for injuries as existing under the common law." *Kilpatrick v. Superior Court*, 105 Ariz. 413, 419 (1970). The clause generally protects from abrogation a wide swath of actions for which recovery was possible in 1912, such as negligence actions, intentional torts, and product liability claims. However, this Court has never held that the clause insulates from legislative action rights of action that were *barred* at common law at the time the constitution was enacted.

**¶14** We acknowledge that two of our cases, *Boswell* and *Hazine*, contain dicta implying that the anti-abrogation clause extends to all rights of action regardless of when those rights were recognized. The Court first employed this language in *Boswell*, stating that "[a]lthough [the anti-abrogation clause] preserves common law rights, our common law is not frozen as of 1912." 152 Ariz. at 17. The *Boswell* Court thus opined that the anti-abrogation clause could cover newly created common law rights of action and "eliminate the legislature's power to control the existence of tort law." *Id.* at 18. *Hazine* contained similar language, claiming the "evolution of common law causes of action—whether in duty, standard of care, or damages—falls within the broad coverage of [the anti-abrogation clause]." 176 Ariz. at 344. But this language is dicta because, despite their expansive language, *Boswell* and *Hazine* only applied the anti-abrogation clause to rights of action recognized by pre-statehood common law, rather than to rights that would not have been recognized at common law in 1912. *See Boswell*, 152 Ariz. at 11 ("The common law imposed strict liability on the publisher of defamatory statements."); *id.* at 17 n.20 (finding "[r]ecovery for emotional distress in a defamation action" was cognizable at common law pre-statehood); *Hazine*, 176 Ariz. at 344 ("[T]he *right of action* to recover damages for injuries caused by defective products was recognized at common law long before Arizona became a territory." (quoting *Bryant v.*

*Cont'l Conveyor & Equip. Co.*, 156 Ariz. 193, 198–99 (1988) (Feldman, V.C.J., dissenting))). Although the dissent argues that disapproval of this dicta offends "principles of stare decisis," *infra* ¶ 69, both cases were correctly decided under the rule we reiterate today, which recognizes that the clause protects rights of action cognizable at statehood. We do not overrule either case—stare decisis is not implicated.

**¶15** We reject the dicta from *Boswell* and *Hazine* because it undermines the legislature's role in developing and restricting tort causes of action that are unprotected by the anti-abrogation clause. The Arizona Constitution does not vest the power to develop tort law solely in the judiciary. *See generally* Ariz. Const. art. 6. The constitution gives the legislature plenary authority to develop the laws of this state, including tort law, subject only to constitutional constraints. Ariz. Const. art. 4, pt. 1, § 1 ("The legislative authority of the state shall be vested in the legislature."). Indeed, pursuant to this power, the legislature limited Arizona common law to the extent it conflicts with our constitution or statutes. A.R.S. § 1-201 ("The common law only so far as it is . . . not repugnant to . . . the constitution *or laws of this state* . . . is adopted and shall be the rule of decision in all courts of this state." (emphasis added)); *see also Hageman v. Vanderdoes*, 15 Ariz. 312, 319–21 (1914) (relying on a precursor to § 1-201 as its basis for a common law decision). Although the dissent posits that "the framers [of the Arizona Constitution] fully expected the Court to develop then-existing common law," *infra* ¶ 64, the constitution nowhere vests in this Court the power to develop common law. And notably, the dissent cites no sources indicating that the framers understood the anti-abrogation clause to insulate from legislative control any new form of tort liability that this Court decides to recognize. As such, interpreting the anti-abrogation clause to prevent the limitation or abrogation of rights of action created post-statehood would wrest control over emerging tort law from the legislature by casting in constitutional concrete newly created causes of action, contrary to over a century of this Court's jurisprudence, *see* Part A ¶¶ 9–12. Therefore, we disapprove any dicta in *Boswell* or *Hazine* indicating that the anti-abrogation clause applies to *all* rights of action. It extends only to rights of action that existed at statehood or that are based in pre-statehood rights.

**¶16** When deciding whether a specific right of action is "based in" a right cognizable at the time of statehood, courts should consider whether a plaintiff alleging the *same harm* could have recovered damages against the

*same type of defendant* at statehood. This inquiry is consistent with the anti-abrogation clause's language, which does not limit itself to protecting specific "causes of action" but rather protects "the right of action." Because a right of action is "merely the right to pursue a remedy," *see Morgan v. Hays*, 102 Ariz. 150, 159 (1967) (Struckmeyer, J., dissenting) (quoting *United States v. Standard Oil Co.*, 21 F. Supp. 645, 660 (S.D. Cal. 1937)), the anti-abrogation clause extends to all injuries remediable at the time of statehood. Unlike the wide net of "simple negligence" that the dissent casts, this narrow inquiry into whether a specific harm allowed damages against a specific type of defendant in 1912 is also consistent with our caselaw.

¶17 For example, in *Boswell* we determined that a plaintiff could have alleged a specific harm (defamation) against a specific tortfeasor (a newspaper) at the time of statehood, and therefore defamation actions were encompassed by the anti-abrogation clause. *See* 152 Ariz. at 11. And in *Hazine* the outcome was correct because the specific harm (an injury caused by a defective product) was cognizable at the time of statehood, as was the theory of strict liability. *Hazine*, 176 Ariz. at 344; *Cronin*, 195 Ariz. at 539 ¶ 36 (stating the *Hazine* Court found strict-products-liability actions were protected by the anti-abrogation clause "because a right of action for injuries caused by defective products *was* recognized at common law, long before Arizona's constitution was established"). Conversely, in *Cronin* we found the clause did not apply because the specific harm (wrongful termination of employment in violation of public policy) was incognizable at statehood. 195 Ariz. at 539 ¶ 39. In *Dickey*, we found the clause did not apply to a negligence action that could not have been raised against a specific type of defendant (a city allowing the public to use land for recreational purposes) at the time of statehood. 205 Ariz. at 6 ¶ 23.

¶18 Having reaffirmed that the anti-abrogation clause only applies to rights of action that existed at common law in 1912 or that are based in such rights, we turn to whether the clause insulates dram-shop actions from legislative control.

## B. Dram-Shop Liability.

¶19 In 1983, this Court held in *Ontiveros* "that the common law doctrine of tavern owner nonliability is abolished in Arizona" and recognized a common law dram-shop action. 136 Ariz. at 513. In so doing, the Court examined "[t]he seminal cases in Arizona" on dram-shop liability

and concluded that "the rule of nonliability for tavern owners has been the common law in Arizona." *Id.* at 504; *see also Pratt v. Daly*, 55 Ariz. 535, 537–44, 546 (1940) (surveying pre-statehood caselaw on the subject and creating a narrow exception to dram-shop nonliability), *overruled by Ontiveros*, 136 Ariz. at 507–08; *Collier v. Stamatis*, 63 Ariz. 285, 290 (1945) ("[I]t has been held by all the courts and by every commentator that the proximate cause . . . of . . . voluntary intoxication is the act of the drinker, and not the act of the seller of the beverage. The principle is epitomized in the truism that there may be sales without intoxication, but no intoxication without drinking."), *overruled by Ontiveros*, 136 Ariz. at 507–08. The Court then overruled caselaw standing "for the proposition that the negligence of a tavern owner in continuing to serve liquor to a patron who is or has become intoxicated can never be the legal cause of a subsequent accident." *Ontiveros*, 136 Ariz. at 507–08 (overruling, among others, *Pratt* and *Collier*).

**¶20** After overruling Arizona's common law doctrine of dram-shop nonliability, the *Ontiveros* Court recognized a common law dram-shop action: "Tavern owners . . . may be held liable when they sell liquor to an intoxicated patron or customer under circumstances where the licensee or his employees know or should know that such conduct creates an unreasonable risk of harm to others." *Id.* at 513. The Court then invited the legislature to weigh in, stating "[i]f we are mistaken in [creating a dram-shop action], it is possibly within the legislative power to confer upon the liquor industry some special benefit exempting it from liability." *Id.*[2]

**¶21** The legislature responded by enacting A.R.S. §§ 4-311 and -312 in 1986. Section 4-311(A) imposes liability upon a liquor licensee that serves alcohol to a patron who is "obviously intoxicated," § 4-311(A)(1), which is defined as being "inebriated to such an extent that a person's physical faculties are substantially impaired and the impairment is shown by significantly uncoordinated physical action or significant physical dysfunction that would have been obvious to a reasonable person,"

---

[2] This invitation is hard to square with the dissent's conclusion that the common law dram-shop action recognized in *Ontiveros* is protected by the anti-abrogation clause. *Infra* ¶¶ 65, 78. Especially because the *Ontiveros* Court, through its author, Justice Feldman, who also authored *Boswell* and *Hazine*, presumably would not have invited the legislature to pass statutes "exempting [liquor licensees] from liability" if such statutes would be unconstitutional. *See* 136 Ariz. at 513.

§ 4-311(D). Section 4-312(B) then limits liquor licensees' tort liability to dram-shop actions brought under § 4-311.

¶22 In 1995, the court of appeals considered whether § 4-311(A)'s "obviously intoxicated" standard violated the anti-abrogation clause by instituting a more stringent standard than the one recognized in *Ontiveros*. *Young*, 184 Ariz. at 189. The court found that § 4-312(B)'s limitation of "dram shop liability to that found in [§] 4-311" did not provide "a reasonable alternative to the general negligence action recognized in *Ontiveros* when [claimants] are injured by a driver that the licensee . . . should know is intoxicated, but the driver is not 'obviously intoxicated.'" *Id.* at 189–90. The court thus held that § 4-312(B) "unconstitutionally abrogates the general negligence cause of action recognized in *Ontiveros*." *Id.* at 190.

¶23 By contrast, the court of appeals in this case disagreed with the *Young* court and held that the anti-abrogation clause does not extend to dram-shop actions. *Torres II*, 253 Ariz. at 77 ¶ 39. It decided that "[e]ven if *Young* was correct in determining § 4-312(B) abrogates" dram-shop actions, "the common law cause of action . . . recognized in 1983 did not exist in 1912." *Id.* at 76–77 ¶ 37. As such, the court found that because a dram-shop action "could not have been maintained at the time the anti-abrogation clause was instituted, the claim is not protected by that clause." *Id.* at 77 ¶ 37.

¶24 We agree with the court below and overrule *Young*'s contrary holding. *Ontiveros* explicitly found that dram-shop liability was rejected by pre-statehood common law and overruled Arizona precedents recognizing the common law rule of dram-shop nonliability. 136 Ariz. at 507–08. Plaintiffs here do not argue that *Ontiveros*'s analysis was incorrect, and we see no reason to depart from it. An injured person at statehood could not sue this *specific type of defendant*—a liquor licensee—for damages caused by an overserved patron.[3]

---

[3] Admittedly, the *Ontiveros* Court stated its adoption of a standard of duty allowing for dram-shop liability was not a "new concept previously unrecognized at common law." 136 Ariz. at 511 n.3. This statement, however, was pertinent only to the Court's analysis of legal duty and does not contradict (1) that Court's earlier conclusion that "the rule of

¶25      Dram-shop actions are sui generis. Despite common elements of proof, they are not, as the dissent argues, simple negligence actions. The right of action hinges on the nature of the injury and the defendant—a nuance that this Court has discerned in other contexts. *See, e.g.*, *Frohmiller*, 60 Ariz. at 468–69 ("[S]ome of the states have held that an occupational disease falls within the common law liability of an employer who is guilty of negligence, but when the constitution of this state was adopted occupational diseases had neither a common law history nor statutory origin."); *Dickey*, 205 Ariz. at 3 ¶ 9 (noting that plaintiff "failed to establish that a right of action for simple negligence, against a municipality engaged in a governmental function, existed at common law"). Accordingly, dram-shop actions are analogous to the negligence actions at issue in *Dickey* and *Morrell*, which were not constitutionally protected because the respective defendants could not have been liable for negligence at the time of statehood. *Dickey*, 205 Ariz. at 6 ¶ 23; *Morrell*, 16 Ariz. at 517. The dissent attempts to distinguish *Dickey* and *Morrell* by arguing they turned "on the sovereign immunity enjoyed by the city-defendants at statehood rather than the nature of the particular negligence actions," and thus "there was no right of action available to people injured by a city's negligence." *Infra* ¶ 72. This is a distinction without a difference.

¶26      The doctrine of sovereign immunity is not sacrosanct: just as dram-shop nonliability was a judicially created common law rule, "the doctrine of sovereign immunity was originally judicially created" and "having been engrafted upon Arizona law by judicial enunciation may properly be changed or abrogated by the same process." *Stone v. Ariz. Highway Comm'n*, 93 Ariz. 384, 393 (1963). In overturning the doctrine, the Court in *Stone* noted that *State v. Sharp*, 21 Ariz. 424 (1920), was "[t]he first case in Arizona" to hold a sovereign immune from tort liability and did so "[w]ithout examining any real basis or reason for sustaining the doctrine" beyond its historical use. *Stone*, 93 Ariz. at 389. Subsequent decisions in the period between *Sharp* and *Stone* "followed the rule without arriving at any basis other than that of stare decisis." *Id.* The dissent references a comparison to Washington state constitutional law, but this Court has acknowledged that "[i]n other states, including Arizona, the court, rather

---

nonliability for tavern owners [was] the common law in Arizona," *id.* at 504, and (2) that Court's decision, in light of evolving standards of causation, to overrule numerous cases establishing the common law rule of dram-shop nonliability, *id.* at 507–08.

than the legislature, abolished the judicially-created doctrine of sovereign immunity." *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 201 ¶ 18 (2001).

¶27 A plaintiff *could* sue a city-defendant for negligence in 1912, but governmental immunity would ultimately bar the plaintiff's recovery as a matter of law. *See, e.g.*, *Morrell*, 16 Ariz. at 512 (involving this scenario). Similarly, a 1912 plaintiff could sue a dram shop for injuries caused by a patron who was overserved—however, the doctrine of dram-shop nonliability would ultimately bar the plaintiff's recovery as a matter of law. If the anti-abrogation clause does not extend to the city-defendants in *Morrell* and *Dickey* because they would have been immune from tort liability at the time of statehood, *see Morrell*, 16 Ariz. at 517; *Dickey*, 205 Ariz. at 6 ¶ 23, it makes little sense to extend it to liquor licensees who also would have not been liable in 1912 for injuries caused by overserved patrons.

¶28 In sum, dram-shop actions are not based in a right of action recognized by our pre-statehood common law and are outside the scope of the anti-abrogation clause. Consequently, the legislature's limitation of dram-shop liability to actions brought under § 4-311, *see* § 4-312(B), does not run afoul of the anti-abrogation clause by abrogating the common law dram-shop action recognized in *Ontiveros*.

### III.   CONCLUSION

¶29 We vacate the court of appeals' decision but affirm its ruling and remand to the trial court for entry of judgment in favor of JAI.

BOLICK, J., concurring:

¶30        I concur fully in the Court's well-reasoned decision.  I write separately to further address the dissent, which urges us to assert expansive policymaking powers that are reserved by the Arizona Constitution to the people and their elected representatives.  *See Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 4 ¶ 8 (2013) ("The legislature and electorate 'share lawmaking power under Arizona's system of government.'" (quoting *Ariz. Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 469 ¶ 7 (2009))).

¶31        The dissent relies heavily on stare decisis, thus implying excess on the part of the majority in upholding a statute grounded in the state's police power.  But even to the extent it finds support in precedent, the dissent greatly aggrandizes judicial policymaking power.  It proceeds from the premise that the judiciary's power to "evolve" common law is "plenary."  *Infra* ¶ 63.  *See Plenary*, Random House Webster's College Dictionary (2nd ed. 1997) ("full; complete; entire; absolute; unqualified").  Thus, in the dissent's view, so long as the resulting rule derives from a generic tort recognized at statehood (here, negligence), the judiciary possesses unbounded power to create new duties, liabilities, and damages; not only those that did not exist when our state was established, but even those that were actually prohibited.  Even beyond that, through an overly expansive application of article 18, section 6, the dissent takes this vision of living common-lawism a giant step further than its cousin, living constitutionalism: once the judiciary has ratcheted up tort exposure, it can never be ratcheted down—not by the legislature, the people acting in their legislative capacity, or even the judiciary itself.

¶32        The dissent is correct that proper development of the common law is inherent in the judicial power.  For hundreds of years, the English common law developed gradually, based on discovery of rules necessary to govern human affairs.  *See Gamble v. United States*, 139 S. Ct. 1960, 1983–84 (2019) (Thomas, J., concurring) ("Common law doctrines, as articulated by judges, were seen as principles that had been discovered rather than new laws that were being made.  It was the application of the dictates of natural justice, and of cultivated reason, to particular cases." (cleaned up)).  But the unfettered judicial development of common law, as the late Justice Antonin Scalia observed, was eventually constrained by "a trend in government that has developed in recent centuries, called democracy."  Antonin Scalia, *A Matter of Interpretation* 7 (1997) (hereinafter *Matter of Interpretation*).  In a

democracy, judges no longer enjoyed unalloyed power to develop common law, because "judges are no longer agents of the king, for there are no kings." *Id.*

¶33          Along with American republican democracy came a constitutional separation of powers. In Arizona, that separation is explicit, and so central to our system of government that an entire constitutional article is dedicated to the clear one-sentence command: "The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this constitution, . . . no one of such departments shall exercise the powers properly belonging to either of the others." Ariz. Const. art. 3; *see also Roberts v. State*, 253 Ariz. 259, 268 ¶ 32 (2022) ("What the United States Constitution structurally implies, the Arizona Constitution makes explicit."). Indeed, the separation of powers command precedes the constitutional articles setting forth the powers and duties of the three governmental branches, so that it serves as a baseline principle by which those powers should be construed. With regard to judicial powers, the strict separation of powers reflects the concern expressed in *The Federalist* No. 78, that "liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other departments." *The Federalist No. 78*, at 298 (Alexander Hamilton) (The Legal Classics Library ed., 1983).

¶34          In both the federal and state constitutional settings, the primary policymaking power resides, unquestionably, in the legislature (although in Arizona, the people are also empowered to exercise legislative power). *See State v. Hansen*, 215 Ariz. 287, 289 ¶ 9 (2007) ("Under the Arizona Constitution, the legislature possesses those powers 'not expressly prohibited or granted to another branch of government.'" (quoting *Adams v. Bolin*, 74 Ariz. 269, 283 (1952))); *State v. Ariz. Mines Supply Co.*, 107 Ariz. 199, 204 (1971) (observing that the legislature exercises the state's police power).

¶35          Our Constitution does not expressly invest the judiciary with the power to create common law. Rather, as the dissent recognizes, *infra* ¶ 64, such power is implied. Hence, the legislative power to create public policy should be considered the default rule to which the judicial power, absent express constitutional limitation, should submit. Indeed, that rule is reflected in one of our foundational statutes, which adopts "[t]he common

law only so far as it is . . . not repugnant to or inconsistent with . . . the constitution *or laws of this state*." A.R.S. § 1-201 (emphasis added). We have expressly recognized the essential relationship between this statute and our constitutional separation of powers, holding that "judge-made substantive law is subordinated to contrary legislative acts validly adopted under Article 4. Section 1-201 recognizes this basic constitutional principle, adopting the common law only insofar as it is 'not repugnant to or inconsistent with . . . the laws of this state.' Thus, when a substantive statute conflicts with the common law, the statute prevails under a separation of powers analysis." *Seisinger v. Siebel*, 220 Ariz. 85, 92 ¶ 28 (2009).

¶36 In an opinion joined by the dissenting justice, we recently applied this appropriately modest approach to judicial policymaking in the common law context. In *Quiroz v. ALCOA Inc.*, 243 Ariz. 560 (2018), we observed that "[i]n Arizona, our primary source for identifying a duty based on public policy is our state statutes." *Id.* at 566 ¶ 18. We cited approvingly the following principle demarcating the respective policymaking roles of the legislature and judiciary:

> The declaration of "public policy" is primarily a legislative function. The courts unquestionably have authority to declare a public policy which already exists and to base its decisions upon that ground. But in the absence of a legislative declaration of what that public policy is, before courts are justified in declaring its existence such public policy should be so thoroughly established as a state of public mind, so united and so definite and fixed that its existence is not subject to any substantial doubt.

*Id.* at 566 ¶ 19 (quoting *Ray v. Tucson Med. Ctr.*, 72 Ariz. 22, 35–36 (1951)). By contrast, the decisions cited by the dissent that purportedly invoke open-ended judicial power to "evolve" common law do not even pause to consider the separation of powers ramifications of usurping, displacing, or subjugating the legislature's policymaking role. Although we should always accord due deference to past decisions, our oath as judges is to the Constitution, not to the stare decisis doctrine. Thus, as an opinion by my dissenting colleague observes, we should overturn prior cases if they are clearly erroneous or manifestly wrong. *Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 255 Ariz. 95, ___ ¶¶ 17–20 (2023) (overturning

multiple past opinions in the tort law context). Indeed, I cannot think of a more "compelling reason" for doing so, *id.* ¶ 20, than when the prior decisions transgress the constitutional boundaries of our own power.

¶37 The dissent, relying on past opinions to that effect, asserts that what up-ends legislative hegemony in favor of vast and immutable judicial policymaking power is article 18, section 6, which states in relevant part that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." Ariz. Const. art. 18, § 6. This provision does not by its terms confer any policymaking authority upon the judiciary, though of course as with all constitutional provisions, the judiciary has the power and duty to enforce it.

¶38 But this provision, while important, does not carry the freight the dissent or prior opinions load upon it. If the Constitution's framers wanted to divest the legislature of significant authority, locate it instead in the judiciary, and render it largely unchangeable, they chose a curious place and odd verbiage to do so.

¶39 The dissent asserts this provision was so important that the framers "repeated it when declaring individual rights." *Infra* ¶ 55. Not so. Article 2, section 31 of the Arizona Constitution, which is part of our Declaration of Rights, states in relevant part: "No law shall be enacted in this state limiting the amount of damages to be recovered for causing the death or injury of any person." I take this, by its plain terms, to prohibit any caps on damages as that term was understood by its drafters.

¶40 Similar language appears in article 18, section 6, but it refers to "[t]he right of action to recover damages" that "shall never be abrogated." Ariz. Const. art. 18, § 6. That language does not exist in article 2, section 31. "A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012). So, we are left to determine what is meant by the language that is particular to article 18, section 6; and, to the issue before us here, whether it extends forward to a "right of action" judicially created after the Constitution was adopted.

**¶41**          "When construing a constitutional provision, we seek to give terms the original public meaning understood by those who used and approved them," read in their overall context. *Matthews v. Indus. Comm'n*, 254 Ariz. 157, 174 ¶ 29 (2022).  One would think that a companion to article 2, section 31 that applied to all circumstances and all causes of action recognized in the past or future would likewise appear in the Declaration of Rights.  But it does not.  Instead, it appears in article 18, which deals with "Labor."  If article 18, section 6 speaks to all circumstances and all causes of action, both past and future, it is a strange coupling with sections in the same article dealing with an eight-hour workday (section 1), child labor (section 2), contractual immunity of employer from liability for negligence (section 3), employer's liability (section 7), and workmen's compensation (section 8).

**¶42**          The positioning of section 6 within article 18 likely explains the choice of the term "[t]he right of action."  "The" is singular, whereas "a" may be singular or plural.  "Unlike the indefinite article 'a,' 'the' is a definite article used in reference to a particular thing . . . ." *Smith v. Melson, Inc.*, 135 Ariz. 119, 121 (1983).  Had the framers intended a plural meaning, they could have used the term "rights" or "causes," but they did not.  Thus, both the words used and their surrounding context indicate that "[t]he right of action" referred to a specific, existing labor-related right of action.

**¶43**          It turns out that was exactly what the framers intended.  In a definitive law review article addressing this precise topic, University of Arizona law professor Roger C. Henderson accomplished what this Court has never even attempted: a deep historical analysis of the aims and sequence of events that led to the adoption of article 2, section 31 and article 18, section 6; of whether the two provisions are in fact largely redundant, as the dissent and some prior opinions posit; and whether the latter provision was designed to apply to a narrow set of circumstances or rather to "benefit all."  Roger C. Henderson, *Tort Reform, Separation of Powers, and the Arizona Constitutional Convention of 1910*, 35 Ariz. L. Rev. 535 (1993).

**¶44**          Professor Henderson recounts that the "main concern" at the time of constitutional ratification "was the plight of the worker who, when injured on the job, was faced with a formidable trilogy of defenses—fellow-servant doctrine, assumption of risk, and contributory negligence—when a tort action was brought against the employer."  *Id.* at 608; *see also* Ariz. Const. art. 18, § 4 (forever abrogating the "common law doctrine of fellow

servant, so far as it affects the liability of a master for injuries to his servant resulting from the acts or omissions of any other servant or servants"). What became article 2, section 31 initially included language limiting it to employee damages, but that language was removed and the provision made more universal by adding it to the Declaration of Rights. Henderson, *supra*, at 583, 602. By contrast, article 18, section 6 remained in the labor article, and as constitutional delegate Michael Glen Cunniff explained, the aim of the labor article was "merely to insure the using of every possible safety appliance and devise [sic], and to make the employers hold life less cheaply." John S. Goff, *The Records of the Arizona Constitutional Convention of 1910*, at 882 (1991).

¶45    Scouring the convention history, Professor Henderson reports that "[t]here was no mention or even a suggestion" that any of the Article 18 provisions "would apply outside the employer-employee context." Henderson, *supra*, at 613. Thus, "there does not appear on the basis of the evidence available today to be any real justification for holding that the guarantees under Section 6 of Article XVIII were ever intended for the 'benefit of all.'" *Id.* at 617. Beyond the labor context to which the provision was specifically directed, Henderson suggests that personal injury plaintiffs should look to equal protection or due process principles to protect their rights. *Id.* at 617–18. "[T]his more traditional allocation of powers between the courts and the legislature," he concludes, "is far more salutary than a position that ostensibly permits the courts to make-up all the law they want without the elected representatives in the legislature having any say about it." *Id.* at 618.

¶46    Stare decisis may support a broader scope for article 18, section 6 recognized by prior cases. But to the extent that past decisions have rendered it so broad that it insulates judicially invented causes of action against legislative modification or repeal and subverts separation of powers by asserting "plenary" common law policymaking authority, we should correct our past errors. *See Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 346 (Martone, J., dissenting) (stating that the Court has "constitutionalize[d] the law of torts" and that article 18, section 6 provides "no authority for such an exceptional proposition"). Indeed, elsewhere we have done so by overturning *Little v. All Phoenix South Community Mental Health Center*, 186 Ariz. 97 (App. 1996), which applied article 18, section 6 to freeze a judicially created common law doctrine against legislative modification. *Avitia v. Crisis Preparation and Recovery Inc.*, CV-22-0288-PR,

slip op. at 20–21 ¶ 39 (Ariz. Oct. 16, 2023). By allowing such rulings to stand, we would continue to license ourselves to exercise legislative powers that we do not possess.

¶47            In addition to preventing any branch of government from accreting too much power, separating legislative and judicial powers reflects the lesson that each branch is manifestly unsuited to exercise the powers of the other except in narrowly specified instances (such as legislative impeachment powers or judicial rulemaking powers). In particular, the judicial forum is especially inappropriate for rendering major policy decisions. In a typical case, we have before us only two parties, who seek their own ends and cannot possibly represent the vast range of interests implicated by most major policy decisions. We are unequipped to weigh such competing interests, and in fact should insulate ourselves from considerations outside the dispute before us and the governing law. Our decisions are typically fact-bound, they cannot and do not anticipate all possible applications.

¶48            By contrast, the legislative process is designed to take all interests into account, to weigh them and make necessary trade-offs, and to produce rules to govern a wide range of situations. *See Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 220 Ariz. 587, 595 ¶ 20 (2009) (stating that we exercise legislative deference "not only because legislative enactments originate with a coequal branch of government, but also because that institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions" (internal quotation marks omitted) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195–96 (1997))). And those rules are apt to be altered based on subsequent experience, whereas correcting flawed jurisprudence requires costly and time-consuming litigation and is bound by stare decisis.

¶49            Thus, when my dissenting colleague laments the possible ramifications of our decision, *infra* ¶ 82, she may be entirely right; but those concerns are properly directed to the legislature, not to us. Far worse than judicial restraint in these circumstances is a judiciary that makes sweeping public-policy pronouncements that, by the dissent's reckoning, cannot be changed short of constitutional amendment.

¶50        How then do we appropriately reconcile the judiciary's residual common law powers and duty to enforce constitutional provisions with the legislature's policymaking authority?  In the first instance, as the dissent suggests, we must apply article 18, section 6 to prevent any abrogation of the right of action specified in that section.  But as the opinion of the Court aptly reasons, that limitation on legislative authority refers only to rights of action that existed at common law in 1912 or are based in such rights.  *Supra* ¶ 18.  It cannot apply to actions like the one here which, as the dissent acknowledges, would have been dismissed at statehood *as a matter of law*.

¶51        Beyond that, the courts have authority to apply the common law to new circumstances and to adopt new rules, but in so doing we are subject to legislative authority to modify our handiwork.  § 1-201.  When developing the common law, we should always be mindful of our separation of powers boundaries.  We recently addressed this issue in the context of an incursion by an executive agency into legislative prerogatives involving a "major policy question that the legislature alone may determine."  *Roberts*, 253 Ariz. at 270 ¶ 40.  That same line of demarcation should guide the judicial development of public policy in the common law context, whereby judicial application of existing common law doctrines is permissible but creation of sweeping new duties and liability is not.  *See, e.g.*, *Quiroz*, 243 Ariz. at 579 ¶ 89 (rejecting "a limitless duty framework" that is "impractical, unmanageable, and has never been the law in this state").

¶52        Justice Scalia reminded that "once we have taken this realistic view of what common-law courts do, the uncomfortable relationship of common-law lawmaking to democracy (if not to the technical doctrine of separation of powers) becomes apparent."  *Matter of Interpretation*, *supra*, at 10.  The dissent would subordinate our express separation of powers to an overly expansive view of the judiciary's implied powers.  With great respect to my dissenting colleague, I think the Court today strikes the right and necessary balance.

TIMMER, V.C.J., dissenting:

**¶53** The majority errs, in my view, by equating nonliability for tavern owners under a pre-statehood negligence cause of action with the absence of a "right of action" protected by article 18, section 6, the anti-abrogation clause. By failing to acknowledge constitutional protection for actions as evolved since statehood, the majority effectively returns us to 1912, thereby weakening the anti-abrogation clause's open court access guarantee. In doing so, my colleagues ignore several cases from this Court that interpreted the anti-abrogation clause more expansively. I conclude the majority's holding is both incorrect and contrary to stare decisis principles. For these reasons, and because I also conclude that A.R.S. § 4-312(B) violates the anti-abrogation clause, I respectfully dissent.

## A. A Common Law Dram-Shop Action Is Protected By The Anti-Abrogation Clause.

**¶54** The anti-abrogation clause provides that "[t]he right of action to recover damages for injuries shall never be abrogated," thereby guaranteeing that people will have unhindered access to courts to adjudicate injury claims. Ariz. Const. art. 18, § 6. By its plain language, the clause does not confine its application to particular theories or causes of action that permitted claimants in 1912 to recover compensation for injuries. It means what it says: the right to file an action in a court to recover compensation for injuries cannot be taken away. *See Kenyon v. Hammer*, 142 Ariz. 69, 74 (1984) (concluding that the clause "[c]learly and unequivocally . . . directs that the courts of this state shall be open to the injured and oppressed" (quoting *Daugaard v. Baltic Coop. Bldg. & Supply Ass'n*, 349 N.W.2d 419, 425 (S.D. 1984))); *Kilpatrick v. Superior Court*, 105 Ariz. 413, 419 (1970) (stating that "[without] room for quibbling" and "[w]ithout limitation" the anti-abrogation clause "confers the right to recover damages for injuries as existing under the common law").

**¶55** The anti-abrogation clause was not a mere afterthought in the Arizona Constitution. The progressive-minded framers, who made up the majority of the constitutional convention, included it as part of a platform aimed, in part, at recognizing individual freedoms and protecting them from interference by a government heavily influenced by powerful private interests. *See* John D. Leshy, *The Arizona State Constitution* 8–9, 20 (2nd ed. 2013) (hereinafter, "Leshy"). As such, our anti-abrogation clause

guarantees court access to seek redress for injuries, making it unique among other states' "open court" provisions. *See Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 9, 12–13 (1986) (describing the clause as a "more specific and stronger" version of other states' "open court" provisions) (citation omitted); *Kenyon*, 142 Ariz. at 83 (holding that the clause confers a "fundamental right"). The framers felt so strongly about this right they repeated it when declaring individual rights.[4] *See* Ariz. Const. art. 2, § 31 ("No law shall be enacted in this state limiting the amount of damages to be recovered for causing the death or injury of any person."); *Kenyon*, 142 Ariz. at 80 n.9 (describing the "hard-fought battles waged on the floor of the constitutional convention of 1910" that culminated in adopting article 18, section 6 and article 2, section 31, and concluding that "the two provisions were intended to guarantee the same basic right").

**¶56** In short, the anti-abrogation clause "constitutionalize[d] the right to obtain access to the courts and a remedy for damages sustained." *Boswell*, 152 Ariz. at 13; *see also Ruth v. Indus. Comm'n*, 107 Ariz. 572, 575 (1971) ("The case law is replete with the history of the [anti-abrogation clause]" and reveals that the clause "was enacted to elevate the common law action of negligence to constitutional stature to preserve the right

---

[4] In his concurrence, Justice Bolick disagrees that article 18, section 6 and article 2, section 31 guarantee the same fundamental right. *See supra* ¶¶ 39–45. But this Court resolved any uncertainty decades ago by providing a detailed account of events at the constitutional convention. *See Kenyon*, 142 Ariz. at 80 n.9. Both provisions emanate from the same proposition, which originally applied only to employer-employee situations. *See id.* After inquiry from delegates about why the anti-abrogation guarantee should not protect all people involved in an accident, death, or injury, delegate Cunniff successfully moved to expand the proposition to become article 18, section 6. *Id.* Thereafter, Cunniff successfully moved for the provision to be included under the declaration of rights as article 2, section 31 simply as "a matter of compilation" of individual rights. *Id.* (citing Journal, December 5, 1910, p. 2). Although the first sentence in article 18, section 6 was not repeated in article 2, section 31, "[i]t is fair to suppose that by curtailing the legislature's power to limit the amount of damages recovered" the framers "intended to proscribe legislation which would abolish or abrogate causes of action, since abrogation not only limits the amount recoverable but allows no recovery at all." *Id.*

inviolate."); *Moseley v. Lily Ice Cream Co.*, 38 Ariz. 417, 420 (1931) (finding "no question" that the common law action for negligence is a constitutional action that "cannot be abrogated by the Legislature"); *Alabam's Freight Co. v. Hunt*, 29 Ariz. 419, 443 (1926) (recognizing that "the common-law action of negligence" is "imbedded in the Constitution"). Arizonans have jealously guarded the anti-abrogation clause and its article 2 companion clause, defeating proposals in 1986, 1990, and 1994 to amend the constitution to give the legislature authority to curb the clauses' effects, including "limit[ing] damage awards and causes of action in ordinary negligence cases (the 1986 amendment)."[5] Leshy at 387.

¶57 The pivotal issue here involves determining which rights of action are "constitutionalized" under the anti-abrogation clause. We do not write on a blank slate, because we have confronted the topic many times. *See, e.g.*, *Cronin v. Sheldon*, 195 Ariz. 531, 538–39 ¶¶ 33–39 (1999); *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 343–44 (1993); *Bryant v. Cont'l Conveyor & Equip. Co.*, 156 Ariz. 193, 195 (1988), *overruled by Hazine*, 176 Ariz. at 344; *Boswell*, 152 Ariz. at 13.

¶58 This Court interprets the anti-abrogation clause "broadly and unrestrictively," *Cronin*, 195 Ariz. at 538 ¶ 35, and we have repeatedly recognized that the "right of action" protected by the anti-abrogation clause "is not limited to those elements and concepts of particular actions which were defined in our pre-statehood case law." *Boswell*, 152 Ariz. at 17–18 (extending anti-abrogation clause protection to emotional distress damages, although such damages were first recognized post-statehood); *see also Hazine*, 176 Ariz. at 344–45 (recognizing that although a strict products liability action did not exist at statehood, the anti-abrogation clause protected the right to bring it); *Humana Hosp. Desert Valley v. Superior Court*, 154 Ariz. 396, 399 (App. 1987) (concluding that a negligent supervision cause of action is protected by the anti-abrogation clause even though the action was first recognized in 1972); *Franks v. U.S. Fid. & Guar. Co.*, 149 Ariz. 291, 299–300 (App. 1985) (extending anti-abrogation clause protection to the tort of bad faith, although this cause of action was not recognized until 1981). Thus, the majority overstates matters, in my view, by asserting that for "over a century of jurisprudence, this Court has never extended the

---

[5] In 2012, however, the voters amended both clauses to protect felony crime victims by abrogating damage claims against them filed by their perpetrators. *See* Leshy at 387.

anti-abrogation clause's protections to rights of action incognizable at statehood." *See supra* ¶ 9.

**¶59** Importantly, however, the protected "right of action" does not envelop *all* tort causes of action existing today. *See Cronin*, 195 Ariz. at 538–39 ¶¶ 35–36. Instead, it includes only "tort actions that 'either existed at common law or evolved from rights recognized at common law.'" *Dickey ex rel. Dickey v. City of Flagstaff*, 205 Ariz. 1, 3 ¶ 9 (2003) (quoting *Cronin*, 195 Ariz. at 539 ¶ 39).

**¶60** I disagree with my colleagues that the common law dram-shop cause of action this Court recognized in *Ontiveros v. Borak*, 136 Ariz. 500, 513 (1983), is not a "right of action" protected by the anti-abrogation clause. Despite its unique name, the action is just one for simple negligence. It seeks compensation from a liquor licensee who creates a dangerous situation by overserving an already intoxicated patron who then drives and injures or kills someone. *See id.* Success depends on proving negligence elements memorized by all first-year law school students: duty, breach, causation, damages. *See id.* A simple negligence action to recover compensation for physical injuries indisputably existed at statehood. *See, e.g., S. Pac. Co. v. Hogan*, 13 Ariz. 34 (1910); *see also Bryan v. S. Pac. Co.*, 79 Ariz. 253, 256 (1955) (describing simple negligence as "involv[ing] the creation of an unreasonable risk of bodily harm to another"); *cf. Indus. Comm'n v. Frohmiller*, 60 Ariz. 464, 468–69 (1943) (disallowing constitutional protection for recovering damages due solely to an occupational disease rather than physical injury because no such right of action existed at statehood). Consequently, a claim that a liquor licensee owed a duty to the traveling public and breached that duty by overserving alcohol to a customer who, as a result, drove while impaired and struck and injured or killed another person is a right of action protected by the anti-abrogation clause. *See Dickey*, 205 Ariz. at 3 ¶ 9.

**¶61** The majority concludes that a common law dram-shop cause of action is not a protected right of action because it was newly created in 1983 when *Ontiveros* recognized its viability, and, therefore it cannot be based on a pre-1912 cause of action. *See supra* ¶ 24. As support, the majority points to the *Ontiveros* Court's acknowledgment that at common law a tavern owner could not be found liable for injuries caused by an intoxicated patron. *See id.*; *Ontiveros*, 136 Ariz. at 504. The majority finds that a common law dram-shop cause of action falls outside the anti-abrogation

clause's guarantee because "[a]n injured person at statehood could not sue this *specific type of defendant*—a liquor licensee—for damages caused by an overserved patron." *See supra* ¶ 24.

**¶62** Respectfully, I believe the majority is mistaken for several reasons. First, nonliability is not the same as the absence of a right of action. The negligence cause of action existed before 1912. But as the *Ontiveros* Court explained, "concepts of causation" insulated tavern owners from liability because "the drinking of the liquor, and not the selling of it" was considered the cause of injury. 136 Ariz. at 505. In short, an injured party before 1912 had the right to sue a tavern owner for bodily injuries inflicted by an impaired patron, but the owner would have prevailed due to the inability of the plaintiff to prove an element of that claim—causation.

**¶63** Second, the majority's view fails to credit the Court's ability to develop elements underlying a common law negligence action "when changed conditions and circumstances establish that it is unjust or has become bad public policy." *See id*. at 504. As we stated in *Cronin*, a case the majority cites repeatedly: "The common law is and has been a product of the courts for hundreds of years. To adopt the common law is, by definition, to adopt the plenary role of the judiciary in its continuing development. Courts also participate in the development of public policy." 195 Ariz. at 537 ¶¶ 26–27; *see also Boswell*, 152 Ariz. at 17 ("Although [the anti-abrogation clause] preserves common law rights, our common law is not frozen as of 1912.").

**¶64** Thus, at statehood, the framers fully expected the Court to develop then-existing common law causes of action, molding them to fit modern situations unimagined in 1912. *Boswell*, 152 Ariz. at 17. There was no need for the framers to explicitly "vest[] in this Court the power to develop common law," as the majority suggests, *see supra* ¶ 15, just as there was no need to explicitly vest this Court with the power to declare acts of other branches unconstitutional (judicial review). *See* Leshy at 18 (stating that the "power of judicial review . . . was assumed by the framers to exist, although it was not expressly provided for in the constitution itself"). It was a given. Significantly, the anti-abrogation clause contains no language limiting its application to rights of action only as evolved in 1912. *See Boswell*, 152 Ariz. at 13 ("The constitutional text being unrestricted, it would be inappropriate for this court to restrict the guarantee by adding words of

limitation 'contrary to the plain language used.'" (quoting *Kilpatrick*, 105 Ariz. at 419–20)).

**¶65** *Ontiveros* found that causation concepts had evolved to a rule allowing a liquor licensee to be held liable in appropriate circumstances for overserving a patron who later injures someone due to impairment.[6] 136 Ariz. at 506. Applying this evolved understanding of causation to overturn the rule of nonliability neither created a new cause of action nor removed negligence claims against tavern owners from the anti-abrogation clause's protection. *See Hazine*, 176 Ariz. at 343–44 ("The evolution of common law causes of action—whether in duty, standard of care, or damages—falls within the broad coverage of [article 18, section 6].");  *see also Cronin*, 195 Ariz. at 539 ¶ 39 ("[T]he anti-abrogation clause applies only to tort causes of action that either existed at common law or evolved from rights recognized at common law.").

**¶66** The majority dismisses *Boswell*'s and *Hazine*'s conclusions that the anti-abrogation clause applies to pre-statehood causes of action as evolved after 1912 as incorrect dicta. *See supra* ¶ 14. I disagree. Despite the majority's characterization, neither case held that the anti-abrogation clause extends to protect *all* tort causes of action, whatever their origins. *See Cronin*, 195 Ariz. at 539 ¶ 36 ("What we did *not* do in *Hazine*, however, is extend constitutional protection to all tort causes of action, whenever or however they may have arisen."). *Boswell* recognized that the anti-abrogation clause "preserv[ed] the ability to invoke judicial remedies for those wrongs *traditionally recognized at common law*." 152 Ariz. at 17

---

[6] *Ontiveros* acknowledged that sometimes "the public interest, constitutional considerations, or both, require special rules to protect certain businesses, professions or occupations from the ordinary theories of tort liability." 136 Ariz. at 512. Although it "[did] not find such considerations applicable to the liquor industry," the Court stated that if it was mistaken, the legislature could "possibly" exempt the liquor industry from liability. *Id.* at 513. The majority interprets this statement as an "invitation" to the legislature to exempt the liquor industry from liability and implies it reflects the *Ontiveros* Court's belief that a dram-shop action is not protected by the anti-abrogation clause. *See supra* ¶ 20 n.2. This was an aside, not an invitation. Regardless, the impact of the anti-abrogation clause on dram-shop actions was not before the Court or even mentioned. Thus, the statement lacks any bearing on the issue before us.

(emphasis added). It then concluded that although plaintiffs in defamation actions could not recover for emotional distress at statehood, because the right of action for defamation had evolved to include such damages, the anti-abrogation clause protected the right to recover those damages. *Id.* at 17–18. Similarly, *Hazine* recognized that the anti-abrogation clause protects only causes of action that existed at statehood or have a basis in a pre-statehood cause of action. 176 Ariz. at 343–44. Thus, it concluded that because "[t]he right to recover for injuries caused by products was, of course, recognized at common law . . . the development of strict liability causes of action to vindicate that right" is protected by the anti-abrogation clause. *Id.* at 344.

¶67 My colleagues' snub of *Boswell* and *Hazine* also confuses me, as the majority relies on *Dickey* to conclude that the anti-abrogation clause protects rights of action that "find their 'basis in the common law at the time the constitution was adopted.'" *See supra* ¶ 8 (quoting *Dickey*, 205 Ariz. at 3 ¶ 9). But *Dickey* equated actions based in the common law at statehood with those that "evolved from rights recognized at common law." *Dickey*, 205 Ariz. at 3 ¶ 9 (quoting *Cronin*, 195 Ariz. at 539 ¶ 39). Notably, *Dickey* also relied on *Boswell* for this principle. *See id.* Despite the majority's professed adherence to *Dickey*, its rejection of *Boswell* and *Hazine*, and its conclusion that an action is only based on a pre-statehood right of action if "a plaintiff alleging the *same harm* could have recovered damages against the *same type of defendant* at statehood," *see supra* ¶ 16, leaves me skeptical whether any causes of action that are based in pre-1912 causes of action are constitutionally protected as the framers intended.

¶68 I also disagree with the majority that *Boswell*'s and *Hazine*'s conclusions that the anti-abrogation clause applies to causes of action evolved from pre-statehood actions is dicta. *See supra* ¶ 14. "Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to [the] determination of the case in hand are obiter dicta, and lack the force of an adjudication." *Barrows v. Garvey*, 67 Ariz. 202, 206 (1948) (quoting *Obiter Dicta*, Black's Law Dictionary (3d ed. 1933)). The statements in *Boswell* and *Hazine* concerning evolution formed the basis for their holdings that the anti-abrogation clause protected the plaintiffs' rights of action in those cases. Thus, in *Hazine*, the Court concluded that the anti-abrogation clause protected a strict liability products liability action, even though that cause of action did not exist at statehood. *See Hazine*, 176 Ariz. at 344–45. And in *Boswell*, the Court found

that the plaintiff's action to recover for emotional distress in a defamation case was protected, even though Arizona courts did not permit this damages remedy until 1922. *See Boswell*, 152 Ariz. at 17–18.

¶69 Importantly, even if I disagreed with *Hazine* and *Boswell*, because they were not "clearly erroneous or manifestly wrong," I would adhere to the reasoning in these cases under principles of stare decisis. *See Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 255 Ariz. 95, ___ ¶ 17 (2023) (quoting *State v. Agueda*, 253 Ariz. 388, 391–92 ¶ 20 (2022)). This is particularly so as many cases over several decades have relied on these cases for the contested principle. *See, e.g.*, *Dickey*, 205 Ariz. at 3 ¶ 9; *Cronin*, 195 Ariz. at 538–39 ¶ 35; *Goodman v. Samaritan Health Sys.*, 195 Ariz. 502, 506 ¶ 17 (1999); *Humana Hosp. Desert Valley*, 154 Ariz. at 399.

¶70 The majority contends that stare decisis is not implicated because it agrees with the ultimate outcomes in *Hazine* and *Boswell* and therefore does not overrule either case. *See supra* ¶ 14. With respect, it is difficult to comprehend how the majority can refrain from overruling these cases, at least in part, as they concerned a cause of action (*Hazine*) and a damages remedy (*Boswell*) that did not exist at statehood but evolved from pre-statehood rights. *See Hazine*, 176 Ariz. at 344–45; *Boswell*, 152 Ariz. at 17–18. Regardless, the majority's decision not to overrule *Hazine* and *Boswell* does not alter the fact it now rejects the essential reasoning underlying those decisions that other courts and parties have long relied on. I would not readily abandon that reasoning.

¶71 Third, the majority unpersuasively analogizes common law dram-shop actions to the negligence actions at issue in *Dickey* and *Morrell v. City of Phoenix*, 16 Ariz. 511 (1915), *superseded by statute as stated in City of Phoenix v. Williams*, 89 Ariz. 299, 33 (1961), which this Court determined fell outside the anti-abrogation clause's guarantee. *See supra* ¶ 25. Both *Dickey* and *Morrell* concerned tort actions filed against cities, not a private entity like JAI. *See Dickey*, 205 Ariz. at 2 ¶ 4; *Morrell*, 16 Ariz. at 512. The Court in both cases found that the negligence actions were not protected by the anti-abrogation clause because people did not have a right of action against cities at statehood under any tort cause of action. *See Dickey*, 205 Ariz. at 3 ¶ 9; *Morrell*, 16 Ariz. at 517. In short, the cities were immune from suit. *See Dickey*, 205 Ariz. at 3 ¶ 9 n.3 ("Although negligence suits certainly have their basis in common law, governments generally enjoyed sovereign immunity from suits sounding in tort, a tradition that carried over to this

country.”); *see also Ashton-Blair v. Merrill*, 187 Ariz. 315, 318 (App. 1996) (“Common law immunities . . . do not abrogate a cause of action but are longstanding public policy determinations that causes of action do not exist in certain privileged situations.”).

¶72        *Dickey* and *Morrell* are distinguishable from our case as they turn on the sovereign immunity enjoyed by the city-defendants at statehood rather than the nature of the particular negligence actions. Because in 1912 there was no right of action available to people injured by a city’s negligence, there was no cause of action in those cases that could evolve and find refuge in the anti-abrogation clause. *See Dickey*, 205 Ariz. at 5 ¶ 18; *Morrell*, 16 Ariz. at 513. But the common law rule of nonliability for tavern owners at statehood “was not a rule of immunity.” *Ontiveros*, 136 Ariz. at 505. A right of action for negligence against non-governmental defendants existed at statehood, so that action, along with its evolved causation element, is constitutionally protected. *Dickey* and *Morrell* do not support a contrary conclusion.

¶73        The majority states that this distinction is one “without a difference” because “the doctrine of sovereign immunity was originally judicially created,” so no reason exists why *Dickey* and *Morrell* could not have abrogated sovereign immunity so the negligence actions in those cases could be included within the anti-abrogation clause’s protection. *See supra* ¶¶ 25–26 (quoting *Stone v. Ariz. Highway Comm’n*, 93 Ariz. 384, 393 (1963)). I disagree. In *Morrell*, the source of the City of Phoenix’s immunity in territorial days was a legislative directive, not a judicial creation that courts could alter. *See Morrell*, 16 Ariz. at 512–13, 517 (stating that when the constitution was adopted, the city charter in effect served as a territorial law exempting the city from negligence liability). *Dickey* did not identify a specific legislative source for the City of Flagstaff’s pre-statehood immunity but instead relied on *Morrell* and a treatise recognizing that a city cannot be civilly liable for negligent performance of duties “unless a right of action is given by statute.” *Dickey*, 205 Ariz. at 3–4 ¶¶ 10–12 (quoting 6 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 2623 (1913)).

¶74        Also, the *Morrell* and *Dickey* Courts could not have abrogated sovereign immunity contrary to the statutory immunities at issue in those cases, as the majority suggests. The constitution’s “immunity clause” empowers the legislature to “direct by law in what manner and in what courts suits may be brought against the state.” Ariz. Const. art. 4, pt. 2, § 18.

This clause "confers upon the legislature a power to control actions against the state that it does not possess with regard to actions against or between private parties." *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 203 ¶ 24 (2001). Because the immunity clause is more specific than the anti-abrogation clause, legislatively granted immunity does not violate the latter clause, and courts have no power to change that outcome. *See id.* at 199 ¶ 11, 203 ¶ 24; *see also Andrews v. State*, 829 P.2d 250, 251–52 (Wash. Ct. App. 1992) ("We start with the proposition that the abolition of sovereign immunity is [a] matter within the legislature's determination. This is not because the court says so, but because the constitution so states." (quoted with approval in *Clouse*, 199 Ariz. at 201 ¶ 17)).

¶75        My colleagues fear constitutionalizing the evolution of tort common law by appellate courts, contending it would "wrest control" from the legislature and violate our separation of powers. *See supra* ¶¶ 15, 36. Justice Bolick, in particular, contends I seek to "aggrandize[] judicial policymaking" and "subordinate our express separation of powers" all while giving too much deference to stare decisis. *See supra* ¶¶ 31, 52. Not so. I simply seek to fulfill the framers' intent in defining and limiting the powers given to each branch.

¶76        I have not crafted some expansive new principle out of whole cloth. All of us acknowledge that this Court has held many times that the anti-abrogation clause protects rights of action either existing at statehood or that have evolved from such rights of action. The majority and I disagree with the application of this principle here. Justice Bolick goes further by stating we should disregard the cases I rely on to decide that a dram-shop action is protected by the anti-abrogation clause. *See supra* ¶ 36. He recognizes that "[s]tare decisis may support a broader scope for article 18, section 6 recognized by prior cases," *see supra* ¶ 46, yet he chides me for following that important doctrine. But this Court should not readily disregard long-adhered-to cases. As we said earlier this year, "[t]he [stare decisis] doctrine is rooted in the public policy that people should be able to rely on judicial precedent to know their rights and order their conduct accordingly." *See Laurence*, 255 Ariz. at ___ ¶ 17. Our prior cases interpreting the anti-abrogation clause should stand unless they are clearly erroneous or manifestly wrong. In my view, my colleagues have not demonstrated this circumstance. *See id.*

¶77 Justice Bolick also generally describes the judiciary's place in our democracy, and then concludes that my interpretation of the anti-abrogation clause violates our constitutional separation of powers. *See supra* ¶¶ 32, 52. But the Arizona Constitution, unlike the federal constitution, contains a uniquely strong anti-abrogation clause, which limits the powers exercised by all branches, including the judicial branch. Although I agree with Justice Bolick that the common law must generally yield to legislative directives, that is not so for common law tort actions based on pre-statehood rights of action. Our progressive-minded constitutional framers so feared governmental interference with people's ability to recover compensation for injuries under common law actions, that they unrestrictedly guaranteed open access to our courts to redress injuries not once but twice. If that was a poor idea, we should leave it to the people to change the constitution.

¶78 In sum, I conclude that the common law dram-shop action is a right of action protected by the anti-abrogation clause. I therefore address whether A.R.S. § 4-312(B) unconstitutionally abrogates that action.

## B. A.R.S. § 4-312(B) Violates The Anti-Abrogation Clause.

¶79 The legislature may regulate a tort cause of action protected by the anti-abrogation clause if a claimant is left with "reasonable alternatives or choices" to bring the action. *See Barrio v. San Manuel Div. Hosp.*, 143 Ariz. 101, 106 (1984). But the legislature cannot, "under the guise of 'regulation,' so affect the fundamental right to sue for damages as to effectively deprive the claimant of the ability to bring the action." *Id.* This Court said it best in *Barrio*: "The intent of our unique constitutional provisions was to enact a 'different and more advanced' policy . . . 'which made it possible to enforce in court a claim for personal injury or death without the necessity of overcoming practically insurmountable defenses.'" *Id.* (quoting *Indus. Comm'n v. Crisman*, 22 Ariz. 579, 595 (1921) (McAlister, J., concurring)).

¶80 I conclude that § 4-312(B) abrogates the common law dram-shop claim rather than regulates it, and is, therefore, unconstitutional. Section 4-312(B) disallows claims against liquor licensees for injuries caused by impaired patrons who were not "obviously intoxicated" when overserved by the licensee. The legislature defines a person who is "obviously intoxicated," essentially, as someone who is falling-down drunk

or displaying exaggerated physical signs of intoxication. *See* A.R.S. § 4-311(D) (defining a patron as "obviously intoxicated" who is "inebriated to such an extent that a person's physical faculties are substantially impaired and the impairment is shown by significantly uncoordinated physical action or significant physical dysfunction that would have been obvious to a reasonable person"). With this restriction, a person injured by a drunk driver who was not, for example, staggering about or slurring speech when overserved "mega buckets" of beer, as occurred in this case, or an excessive number of alcoholic drinks, as occurred in *Young v. DFW*, 184 Ariz. 187, 189 (App. 1995), cannot recover for the liquor licensee's negligence. Section 4-312(B) bars the injured claimant from access to the court to seek compensation for injuries, despite the fact the licensee knew or should have known that the patron was impaired when served. *See Young*, 184 Ariz. at 189 (involving a 125-pound woman who showed no obvious signs of intoxication although she consumed nine to ten drinks in four hours and had a post-accident blood alcohol concentration of .20). That is abolishment, not regulation. *See Barrio*, 143 Ariz. at 106.

¶81        In sum, because § 4-312(B) abolishes a dram-shop claim for persons like the plaintiffs in this case, whose family members were killed by a drunk driver who was overserved but not "obviously intoxicated" as defined by § 4-311(D), I conclude that the anti-abrogation clause renders § 4-312(B) unconstitutional.

## CONCLUSION

¶82        Today's decision has significant and regrettable judicial and real-world consequences, not only for the plaintiffs here but for future drunk driving victims and other tort claimants who cannot trace their recovery rights to 1912 under the majority's restrictive view of the anti-abrogation clause. As amicus MADD suggests, abrogating the common law dram-shop action "[e]liminat[es] an important, powerful, and longstanding deterrent to businesses pushing last-call pre-closing alcoholic drinks on patrons who have yet to appear intoxicated and are about to leave and get behind the wheel." And a future legislature may now abolish even the statutory dram-shop action while simultaneously prohibiting renewal of a common law action. The courthouse doors would be closed and locked to the injured seeking compensation. To me, this seems precisely what the framers intended to prevent.

**¶83**　　　　For all these reasons, and with great respect to my colleagues, I would vacate the court of appeals' opinion and affirm the superior court's judgment in favor of the accident victims' families.